## The Commonwealth of Pennsylvania v. Abram I. Eckerd, Appellant.

*Criminal law—Evidence—Murder—Felony.*

On the trial of an indictment for murder, it appeared that the prisoner and the deceased had a dispute on the morning of the day when the homicide was committed.   In the afternoon while the deceased was standing in his wagon in a public street, the prisoner came up and began to swear at him.   One witness testified that the deceased made a motion to push the prisoner away, and to kick, but the witness did not see the deceased kick, nor did the deceased attempt to get out of his wagon, or to attack the prisoner.   The prisoner, drawing a revolver and saying, "Well, you are not much of a man," fired three shots at the deceased, one entering his head just under the eye and causing instant death.   The court in its charge said, " there is no dispute as to the fact of a felonious killing," and refused to say as requested by the prisoner, "if the jury believe that there was not a fully formed purpose to kill, but that the act was the immediate offspring of rashness and impetuous temper, the defendant cannot be convicted of murder in the first degree." *Held,* (1) that the court was not in error in referring to the prisoner's act as a " felonious killing ; " (2) that the court was not in error in refusing the instruction requested ; (3) that the fact that the weapon used was a pistol, and was fired three times, raised a presumption of an intent to take life.

Ungoverned and uncontrolled temper is no defense to crime, and it does

not even reduce killing to manslaughter unless it is produced by immediate and legally sufficient provocation.

On the trial of an indictment for murder the prisoner stated that at times he had "spells;" that things "would get black before him, so that he could not see where he was going," and "he would have to get up against the fence to hold fast to something," and afterwards would not remember. He did not pretend that he had any insane impulse at such times. The trial judge directed the jury to examine the testimony on this subject with great care, and directed their attention to the bearing of these temporary conditions of the prisoner's mind on his power of forming a deliberate purpose, and of knowing what he was doing, and then called their attention to the want of corroboration of the prisoner's story on this point, and to the testimony as to his conduct and language at the time and immediately after the shooting. *Held*, that these instructions were clearly within the judge's privilege, if it were not his imperative duty to give them.

It is a most reprehensible practice for an assignment of error to connect two sentences in a judge's charge as if the second immediately followed the first, whereas in the charge as delivered they were separated by fourteen printed lines of very material bearing on the subject.

On the trial of an indictment for murder the court, after telling the jury explicitly that good character is of great importance and not a mere makeweight, is not in error in charging, "where the jury is satisfied beyond a reasonable doubt under all the evidence that the defendant is guilty, evidence of previous good character is not to overcome the conclusion which follows from that view of the case."

The law is and always will be careful of prisoners' rights and tender of human life, but in the present day of mild punishments and scrupulous if not cowardly juries, who shrink from the performance of plain but disagreeable duties, there is no occasion for courts to strain unsubstantial technicalities in favor of criminals whose guilt is clear, and whose defenses will not stand the test of common sense and credibility. Per MITCHELL, J.

Argued Feb. 10, 1895. Appeal, No. 168, Jan. T., 1896, by defendant, from judgment of O. & T. Luzerne Co., Sept. T., 1895, No. 2, on verdict of guilty of murder of the first degree. Before WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed. DEAN, J., dissents.

Indictment for murder. Before WOODWARD, J.

At the trial it appeared that on July 6, 1895, Frederick T. Bittenbender was shot by Abram I. Eckerd on Main street in the borough of Nanticoke. Bittenbender was a member of the school board of Nanticoke borough school district and chairman of the building committee; Eckerd, the defendant, was janitor of the State street school building. On the morning of July 6,

about 10 o'clock, Bittenbender, in company with George W. Gruver, went to the State street school building, where there was some work to be done by Eckerd, but found no one there. He then drove over to Eckerd's home, a distance of several squares from the school building, and there found Eckerd and Mr. Miller, the superintendent of schools, talking, and Miller says in his testimony that he was telling Eckerd how to cut down a fence at the school grounds.

Bittenbender then reprimanded Eckerd and asked him why he was not attending to his duties as janitor, and said that if he (Eckerd) couldn't attend to the work the board would get some one who could do it. Bittenbender noticing that a porch was being built at Eckerd's house remarked that he (Bittenbender) supposed the school work would have to wait until the porch was finished, or something to that effect. Eckerd promised to go to the schoolhouse after dinner and attend to the work, and Bittenbender, Miller and Gruver then drove away.

About two hours after Eckerd came down town to the Main street and saw Bittenbender standing on a buckboard wagon just behind, and holding to, the seat. Bittenbender had bought some celery and had it with him at the time. His father sat on the seat just in front of him and they were waiting for the owner of the buckboard to come out and drive them home to dinner.

Eckerd then came up to where the wagon was standing and stepping off the sidewalk began to swear at Bittenbender about the way the latter treated him that morning. Eckerd himself told a number of witnesses it was about Bittenbender's " abuse in the morning." After a few moments, Eckerd said, " Well, you're not much of a man," and pulling out a revolver, fired three shots at Bittenbender, one entering his head just under the eye and causing instant death.

The court charged as follows :

We have now reached the stage of this trial at which it becomes the duty of the court to submit it to you for final decision, accompanying that submission with such general instructions on the law pertaining to the case, as may be of assistance to you in reaching a final conclusion. Unlike many cases which come before us for trial on the criminal side of the court, there are many things in the present case which are not disputed, and to which we may at the outset call your atten-

tion. [There is no dispute as to the fact of a felonious kill-ing on the 6th day of July last, about the hour of 12 o'clock noon, of one Frederick T. Bittenbender, a citizen of this county, by a pistol shot fired by the defendant at the bar.] [1] The shot took effect under the right eye of the deceased, passing entirely through the brain and coming out at the back part of the skull, as described by the physicians who have testified in the case. The corpus delicti, as it is called—the fact and body of the crime—have been fully established without difficulty or controversy, by the testimony of eyewitnesses to the occur-rence, as well as by evidence of the physicians who made the post-mortem examination of the body of the deceased. The crime of murder at common law embraced all cases where the killing was malicious, although the specific intention and pur-pose to take life were not established. Our Pennsylvania stat-ute on the contrary, divides the felony of murder into two kinds or grades, known as murder of the first degree, and as murder of the second degree respectively; and this distinction under our statute as to the crime of murder, is based on the difference existing where a deliberate intent to take life must be shown, to establish the crime of murder in the first degree; while to establish the crime of murder in the second degree under our statutes, no such specific intent to take life need be shown. To make this clearer to you, I read the statute to you. It provides that "all murder which shall be perpetrated by means of poison or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of or attempt to perpetrate any arson, rape, rob-bery or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree; and the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, ascertain in their verdict whether it be murder of the first or second degree." You observe, gentlemen of the jury, that under this statute it is your duty to find whether the de-fendant is guilty or not guilty of murder, and also to fix the de-gree, if you find him guilty; and while it is in your power and part of your duty under your oaths, to ascertain the degree of the crime committed, if crime was committed, it is also your duty under your oaths, to find the degree according to the law.

as laid down in the statute, not by any arbitrary and wanton exercise of mere power in the premises. You are to be guided by the law in determining the degree of the crime as well as the facts thereof. You observe, gentlemen, that under the statute to which I have called your attention, and upon which the indictment is framed, the killing—the murder—must be willful, deliberate and premeditated. This language has been from time to time interpreted and construed by our courts. Therefore, it is our duty to say to you that if the intention was to take life, the killing was willful. If the intention is accompanied by circumstances showing a mind fully conscious of its own purpose it is deliberate. If sufficient time be afforded to enable the mind to form the design to kill, it is premeditated. Those are the definitions of the terms used in the statute, afforded us by the decisions and adjudications of our courts. [What, then, is the exact and all-important question in the present case, it being established that a murder has been committed, that a citizen of our county has been foully and feloniously killed in broad day in the principal street of one of our large towns, and that this crime was committed by the prisoner at the bar who standing a few feet distant from the deceased fired three shots at him, two of which took effect upon his person and one of which proved fatal? It becomes your simple duty, gentlemen of the jury, to say by your verdict, of what crime the prisoner is guilty.] [2] The commonwealth asks you to say by your verdict, under the evidence in the case, that beyond a reasonable doubt the killing was willful, deliberate and premeditated, and that all the elements, therefore, of murder of the first degree, exist in the case. [The defendant, on the other hand, not denying the fact of the shooting, seeks to escape the allegation of willful killing and of deliberation and premeditation, by the allegation of what may be called temporary aberration of the mind, which made him unconscious of his own action and deprived him of the power of forming a deliberate purpose and of knowing what was done at the time. It therefore becomes your duty to examine the testimony on this subject with the greatest care, and it becomes our duty, in this connection, to call your attention to the fact that this defense interposed by the prisoner, rests entirely on his own testimony and is without any corroboration of other evidence in the cause.

Now, the law makes him a competent witness in his own behalf; he has the right to be sworn or not, as he sees fit. He is made a competent witness by our law as it now stands; but his credibility, his veracity, is a question for the jury, as in the case of any other witness; and the jury are not to forget, of course, that while he is a competent witness, he testifies with feeling in the case, necessarily, in such a trial as the present—a personal interest in the result.

Secondly, I call your attention in this connection to another fact which I regard it my duty to mention—that we have no medical or expert testimony showing or tending to show any connection between the injury to the defendant some years since by the accident which he has described to you, and the attacks of mental aberration and failure of memory which he claims to be a sufferer from.] [3] [Further, and in the same connection, there is no evidence in the case that the prisoner had ever complained to any one of these attacks, or that he was ever disabled from following his ordinary pursuits and doing the work of an ordinarily sound man.] [4] Further inquiry, gentlemen, which will be eminently proper for you to make in this connection is this: Is there anything in his own conduct at the time of the shooting, and just after it, to corroborate this defense and to sustain his claim of mental infirmity and alienation. On this point I call your attention briefly to the testimony of the witnesses. You observe the point we are considering now is testimony as to the fact whether or not the prisoner at the bar knew what he was doing at the time of the event and immediately after it. Winterstein, called as a witness for the prosecution, says, among other things, that he was in a store near the scene of the shooting, and came out after a shot had been fired, and presently heard the prisoner say, " Any man who would treat a man the way he did, ought to be shot." We have the testimony of James Fisher, who was a clerk for Mr. Callery next door or very near to the Winterstein store, who swears he heard Eckerd make the same remark. We have then the testimony of T. R. Callery, who swears that after the shooting he asked the prisoner why he did it, and the prisoner answered that the deceased had abused him. We have on the same subject the testimony of John Reagan, a constable, who heard the same conversation and declaration. We have the testimony of A. C. Hitchler, who

swears that the defendant gave him a revolver after or about the time of the arrest, and told him of the fact of the shooting. We have the testimony of W. J. Fox, who was on the sidewalk very near the parties and heard the defendant say, "You are not much of a man," and then shoot. This witness says also that Callery came up and the defendant then made another statement that he was the man who shot Bittenbender, something to that effect. We have then the testimony of Charles R. Eder, who swears he lived in Nanticoke, is acquainted with the parties, and was at the lockup when Callery asked him why he shot. When Callery asked him why he shot, he said the deceased had abused him like a dog, and also said that he had been drinking; he further said when asked what Bittenbender meant by the reply that he knew what he could do, and so forth, that he meant ceasing to be janitor, as he understood it. We have the testimony of George Small, the motorman on the car, who heard him say that he was the man who did the shooting; and we then have the testimony of Mr. George T. Morgan, who swears that he knows both of the parties, lived in Nanticoke for many years, that he also was at the lockup. "I spoke to the defendant and asked him what the trouble was, and he said that the deceased abused him like a dog, said he did not remember the shooting. I agreed to get his wife or send for her, and then he told me he had had a pint yesterday and had got his bottle filled that morning." We have the testimony in this connection, also, of Joseph Smith, who stood nearly opposite these parties on the street, and heard the shots, saw the man lying on the ground, looked around and saw Eckerd and heard him say he could not stand the abuse of this man any longer. W. H. Thompson, a constable, who took the prisoner to jail, asked him what possessed him to shoot Fred, and he said, after some delay, Fred had abused him in the morning. He asked the defendant if he did not think he made a mistake; the defendant said he was sorry but that Bittenbender had bulldozed him more than once. We have the testimony of Thomas F. Jacobs, who was in a car near by. As he was going along he heard him say, "Yes, I did it; he is no man and I would do it again."

Now, gentlemen, I have called your attention to this testimony in this connection because it is of the greatest importance in the case in the consideration of the defense interposed here

by the prisoner, for reasons which are manifest to you from the mere reading of the testimony, from the fact that to no one of the witnesses, except Morgan, did the prisoner say he did not remember what transpired at the time of the shooting; and that this was immediately after the event. We have the testimony on the part of the defendant, of Sayre, who says that he saw the parties on the day in question, and that the deceased made some motion from the wagon, with his hand, which he described to you in the witness box, and that defendant's hat fell off, that he stooped to pick it up, and as he rose from that posture he immediately fired the shots. No other witness called in the case has testified to any motion made by the deceased, or any offer or indication of an offer to strike a blow. This witness stands alone in this respect. It will be for you to say whether he has told the truth or not, whether his testimony on the whole subject is accurate or not. It has been fully discussed before you by the counsel for the commonwealth and the defendant respectively, but it is our duty to say to you, that mere words of abuse, do not, in the eye of the law, justify violence, even a blow, much less a shot. That is the rule of the law, imperative and unbending on the subject. No matter how aggravating the abuse, how hard to bear, the law does not justify a party in repelling the injury which comes from language and words merely, by violence or blows or shots; nor in case of an attack made by one upon another, does the law recognize the right of the attacked party to use more force or violence than he has a reasonable degree of certainty of feeling is necessary. A man may defend himself from violence, but he may not use more violence to defend himself than the attack justifies reasonably in his own mind.

We come now, gentlemen, to the other branch of the defense, which is that of a previous good character. Quite a large number of witnesses have been called here who testify that according to the speech of the people in the neighborhood in which he has lived, the prisoner, before this occurrence, enjoyed a good reputation as a peaceable citizen. In regard to this defense of good character, we say to you the rule of the law is this: [Where a jury is satisfied from the evidence in the case and beyond a reasonable doubt, that the defendant is guilty in manner and form as he stands indicted, then the reputation of pre-

vious good character goes for nought as affecting the verdict under those circumstances;] [5] and this rule is founded on common observation and experience, by which we know that many men who have enjoyed good characters for years frequently do fall and commit crime. At the same time it is our duty to say to you, that evidence of good character, from the speech of the people—from a man's neighbors—those who have seen him going and coming day after day, for many years, is of great importance to him in any such trial as the present. As is said in the point submitted, it is not a mere makeweight; it is substantial and substantive proof in his behalf, and may give rise to the existence of a reasonable doubt, where such doubt would not otherwise arise, in making it improbable that a man of so good a character would be guilty of so foul a crime. [But as we said to you before, in any case where the jury is satisfied beyond a reasonable doubt, under all the evidence, that the defendant is guilty in manner and form as he stands indicted, evidence of previous good character is not to overcome the conclusion which follows from that view of the case.] [5]

Defendant's points, among others, were:

1. The killing of the deceased by the prisoner at the bar having been proved, the burden is on the commonwealth to prove beyond a reasonable doubt the deliberate and premeditated intent to take life. *Answer:* That portion of the point is affirmed. But the point continues: "and if the jury believe that there was not a fully formed purpose to kill, but that the act was the immediate offspring of rashness and impetuous temper, the defendant cannot be convicted of murder of the first degree." That portion of the point we decline to affirm. [10]

2. If the jury believe that during the altercation between Bittenbender and the prisoner at the bar, Bittenbender struck at or attempted to do violence to the defendant, as testified to by Arthur Sayre, and that then the defendant drew his pistol in the heat of passion, and shot the deceased, there was not the premeditation and deliberation to form the specific intent to take life, and the defendant cannot be convicted of murder. *Answer:* That point we decline to affirm, and for further answer we call your attention to our general charge on the subject of what is sufficient provocation to justify violence or blows or shooting. [11]

3. If the jury believe, from all the evidence in the case, that when the prisoner at the bar shot the deceased his mind was governed by such influences, over which he had no control, then he cannot be convicted of murder. *Answer :* That point we decline to affirm. We do not think it is law or good grammar; I do not exactly understand it. [12]

Verdict of guilty of murder of the first degree, upon which judgment of sentence was passed.

*Errors assigned* were (1–5, 10–12) above instructions, quoting them; (6) that the court erred in omitting and neglecting to charge the jury upon the law of manslaughter; (7) in omitting and neglecting to charge the jury upon the law of insanity; (8) in omitting and neglecting to charge the jury upon the law of intoxication; (9) in omitting and neglecting to charge the jury upon the law of self defense.

*P. M. Thornton, J. F. O'Neill* and *E. F. McGovern, Lewis Dewart* with them, for appellant.—It was clearly error in the court to call the attention of the jury to the failure of the defendant to call medical testimony to corroborate him in his testimony : Com. v. Rothemel, 98 Pa. 300.

There was evidence of that condition of partial insanity produced by excessive drinking, which, while it is no excuse for crime, is nevertheless sufficient to prevent the formation in the mind of that deliberate intention to kill which is the essence of murder in the first degree : Jones v. Com., 75 Pa. 403.

The prisoner has a right to have the jury properly instructed upon every question of law legitimately raised by the evidence. This right he cannot waive, nor can his counsel do so for him. Meyers v. Com., 83 Pa. 143; Goersen v. Com., 99 Pa. 388.

The defendant is entitled to have the law of manslaughter given to the jury if there is any evidence whatever to which this is applicable, no matter how weak or insufficient it may appear to the court: 9 Am. & Eng. Ency. of Law, 742; McLarin v. State, 64 Miss. 529; Potter v. State, 85 Tenn. 88; Liskoski v. State, 23 Texas, App. 165; Roberts v. State, 23 Texas, 170; McLaughlin v. State, 10 Texas, App. 340; Com. v. Drum, 58 Pa. 17.

The law regards and the jury must find the actual intent, that

is to say, the fully formed purpose to kill, with so much time for premeditation and deliberation as to convince them that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design: Jones v. Com., 75 Pa. 403 ; Green v. Com., 83 Pa. 80.

Evidence of good character is to be weighed and considered in connection with all the other evidence in the cause : Com. v. Cleary, 135 Pa. 64 ; Becker v. Com., 9 Atlantic, 510.

*D. A. Fell, Jr.*, district attorney, and *John M. Garman*, for the commonwealth.—As sanity is presumed, when the fact of insanity is alleged it must be satisfactorily proved: Ortwein v. Com., 76 Pa. 414 ; Lynch v. Com., 77 Pa. 213.

The crime committed by the prisoner could not be manslaughter in any view of the case which could be justified by the undisputed facts in proof: Brown v. Com., 76 Pa. 339 ; Shaffer v. Com., 72 Pa. 68 ; McMeen v. Com., 114 Pa. 304 ; Clark v. Com., 123 Pa. 575 ; Com. v. Crossmire, 156 Pa. 304.

OPINION BY MR. JUSTICE MITCHELL, March 2, 1896 :

The first and second assignments of error are founded on the judge's use of the word "felonious" in describing the killing. But there was no error in this. The killing was not denied, and there were no circumstances testified to by any witness which in the most favorable aspect could reduce it below the grade of felony.

The third, fourth and seventh assignments relate to the omission to charge on the law of insanity, and to what the judge said on the subject of temporary aberration as bearing on the prisoner's power of conscious and deliberate action. There was nothing in the case which called for discussion of the law of insanity. The prisoner himself made no defense on that ground. All he said about his "spells" was that at times things "would get black" before him, so that he "could not see where he was going, and would have to get up against the fence or hold fast to something" and afterwards would not remember. But even he made not the least pretense to any insane impulse at such times. The learned judge stated the bearing of these temporary conditions of the prisoner's mind on his power of forming a deliberate purpose and of knowing what he was doing, gave the

jury a direction " to examine the testimony on this subject with the greatest care," and then called their attention to the want of corroboration of the prisoner's story on this point, and to the testimony as to his conduct and language at the time and immediately after the shooting. All this was clearly within the judge's privilege, if not his imperative duty.

The fifth assignment of error relating to the charge on the subject of good character, and the argument in support of it, rest on the assumption that the jury were directed to separate that branch of the testimony from the rest, and if they were satisfied from the other testimony that the prisoner was guilty, then good character would not avail. The charge however is not open to this construction. The assignment connects two sentences as if the second immediately followed the first, whereas in the charge as delivered they are separated by fourteen printed lines of very material bearing on this subject. This is most reprehensible practice. The judge did not use the word "other," or draw any distinction between the testimony as to good character and as to the rest of the matters concerned. On the contrary his expression was, " where the jury is satisfied from the evidence in the case," meaning clearly all the evidence, and then, after telling the jury explicitly that good character was of great importance and not a mere makeweight, he concluded the subject by saying " where the jury is satisfied beyond a reasonable doubt, under all the evidence that the defendant is guilty, evidence of previous good character is not to overcome the conclusion which follows from that view of the case." This was a correct statement of the law.

There was no evidence in the case that called for any charge on the subjects of intoxication or self-defense, and the eighth and ninth assignments may be dismissed without further discussion.

The sixth, tenth, eleventh and twelfth assignments may be taken together as they all relate to the degree of the crime. The effort of the prisoner's counsel was to reduce the killing to manslaughter, or at least murder of the second degree, and to this end they put forward in the court below and have argued here, in such varied shapes as ingenuity could suggest, the proposition that if the killing was done in sudden passion it could not be murder of the first degree. But no ingenuity can cover

up the essential defect in this proposition. The passion even though sudden must be upon sufficient provocation, and of this vital element there is no evidence in the case. The only testimony which is claimed as even tending to that end is Sayre's. This witness does say that Bittenbender, the deceased, "either pushed or struck at" the prisoner, but in immediate connection with that, says, "it appeared Mr. Bittenbender wanted to get rid of him, did not care to have him standing there." Again in response to the direction to show how Bittenbender struck or attempted to kick, he said, "well, he pushed him away like that, wanted to get rid of him. Q. Did not kick at him? A. Made a motion to kick. Q. Show us what he did. A. I could not see well enough to swear to that. Q. Show us to the best of your knowledge. A. Well, he made a motion to get rid of him; he pushed him away, like that, a motion to kick him if he did not go away. Q. Did he kick him? A. I didn't see him kick." The deceased was in his buck-board and did not at any time attempt to get out, or to attack the prisoner. This is the whole evidence on this point, and it does not suggest a scintilla of provocation to reduce the shooting below its natural grade, or to rebut the legal presumption that one who fires at a vital part intends to kill.

The tenth assignment, which is the only one in the case that has given us any occasion for doubt, is based on the first point of the defense, that "the killing of the deceased by the prisoner at the bar having been proved, the burden is on the commonwealth to prove beyond a reasonable doubt the deliberate and premeditated intent to take life." So much of the point was affirmed but the second part, that "if the jury believe that there was not a fully formed purpose to kill, but that the act was the immediate offspring of rashness and impetuous temper, the defendant cannot be convicted of murder in the first degree," was refused. It could not have been affirmed without material explanation to qualify its apparent intention. Of course the fully formed purpose to kill is a necessary element of murder of the first degree, and any instruction that misled the jury, or left them in doubt on this point would have been clear error. But there is nothing of that kind here. In the first place the intent to take life, fully formed, is presumed from the use of the weapon, and certainly where as in this case it was fired three times. "The killing with a deadly weapon was admitted.

There was no pretense that the wound was not designedly given. The intent to take life was presumable from the nature of the weapon used." STRONG, J., Kilpatrick v. Com., 31 Pa. 198, 216. But beyond this, the jury were so specifically instructed on the necessity of the existence of the intent to kill that they could not have had a possible doubt about it. The first part of the very point in controversy was that "the burden is on the commonwealth to prove beyond a reasonable doubt the deliberate and premeditated intent to take life." Not only was this affirmed, but subsequently in affirming the defendant's fourth point, the jury were again told that if they had a reasonable doubt about the prisoner's "having premeditatedly and deliberately formed a specific intent to take life" then he was entitled to the benefit of that doubt and could not be convicted of murder of the first degree. A jury thus twice explicitly told that the intent must be deliberate and premeditated and beyond a reasonable doubt, could have had no question that it must be fully formed. But the real animus of the point, and the real complaint of its refusal, were not founded on the few words about the fully formed intent, but on what followed, that if, "the act was the immediate offspring of rashness and impetuous temper" the prisoner could not be convicted. This as already said was the proposition which the defense fought for and rested upon throughout the case. All four of the points now under consideration were mere variations in the expression of the same idea, which was put forth most clearly in the third point, that if the jury believe "that when the prisoner shot the deceased, his mind was governed by such influences over which he had no control, then he cannot be convicted of murder." No such loose and dangerous doctrine has any foothold in our law. Ungoverned and uncontrolled temper is no defense to crime, and does not even reduce killing to manslaughter unless it is produced by immediate and legally sufficient provocation. Of this, as already said, there is not a scintilla of evidence. The latter part of the defendant's first point, which was refused, was but the statement of this proposition in a covert form, the affirmance of which would have been clear error against the commonwealth.

We have thus gone over all the assignments in detail, and we find no error in them. There is no case in our books of more willful and deliberate killing, nor any for a more trivial cause,

nor more wanting in any circumstance of palliation. There was no defense. The attempt at it was so flimsy that the mere statement of it in the charge gave it an apparent importance which its merits did not sustain, and which only the carefulness of the law for the preservation of a prisoner's rights could justify. The judge, feeling the character of the case, set it before the jury in such clear light that a failure of justice could only occur through their willful disregard of the law and the evidence. If his charge seems to lean heavily towards conviction, it is because the evidence only admitted of that result. It was a plain recital of the admitted facts, the evidence, and the law fairly applicable to the case. It nowhere trespassed in any degree on the province of the jury, though it made plain to them their duty to convict. In so doing the judge was but discharging his own duty. When the law of England punished even petty larcenies with death, the humanity of judges sought to mitigate its Draconian severity, in advance of legislative reform, by extreme technicality in favor of life, but the necessity for that has gone by. The law is and always will be careful of prisoners' rights and tender of human life, but in the present day of mild punishments and scrupulous if not cowardly juries, who shrink from the performance of plain but disagreeable duties, there is no occasion for courts to strain unsubstantial technicalities in favor of criminals whose guilt is clear, and whose defenses will not stand the test of common sense and credibility.

The judgment is affirmed and the record remitted to the court of oyer and terminer for the purpose of execution.

MR. JUSTICE DEAN DISSENTING:

I dissent from the judgment in this case. On the testimony of the witness Sayre, the jury might, at least, have doubted as to whether there was not great passion induced by sufficient provocation, at the time the shots were fired by the prisoner. Under such circumstances, it was clearly the duty of the court below to define what constituted manslaughter, and to call the attention of the jury to what evidence would reduce the offense to this lower grade of homicide. He gave no instructions on that subject; of this, the prisoner has a right to complain, and the judgment of the oyer and terminer should be reversed and a new trial granted him.