369 A.2d 1234
**COMMONWEALTH of Pennsylvania**
v.
**Gerald R. CAIN, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 22, 1974.

Decided Jan. 28, 1977.

142

Eugene H. Clarke, Jr., Morris Paul Baran, Philadelphia, for appellant.

Arlen Specter, Dist. Atty., Richard A. Sprague, 1st Asst. Dist. Atty., David Richman, Asst. Dist. Atty., Chief, Appeals Div., William P. Boland, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

### ORDER

PER CURIAM.

The Court being equally divided, the judgments of sentence are affirmed.

EAGEN, J., filed an opinion in support of affirmance in which JONES, C. J., and POMEROY, J., joined.

POMEROY, J., filed an opinion in support of affirmance.

ROBERTS, J., filed an opinion in support of reversal in which O'BRIEN and MANDERINO, JJ., joined.

MANDERINO, J., filed an opinion in support of reversal.

NIX, J., did not participate in the consideration or decision of this case.

OPINIONS IN SUPPORT OF AFFIRMANCE

EAGEN, Justice.

Gerald R. Cain was convicted by a jury in Philadelphia of murder of the first degree and the punishment was fixed at life imprisonment. Cain was also convicted of aggravated robbery, burglary and conspiracy. All charges emanated from the same episode. A motion for a new trial was argued before and denied by a three-judge court.[1] A sentence of life imprisonment was imposed on the murder conviction. Prison sentences were also imposed on the three other convictions; however, it was directed that these sentences run concurrently with the life imprisonment sentence. This appeal followed.

While the sufficiency of the evidence to sustain the convictions is not now challenged, an examination of the record is persuasive that the trial evidence was more than ample to warrant the guilty verdicts. From the evidence the jury could find the following.

Glenn Edwards accompanied by Charles Green, a resident of Philadelphia, came to Philadelphia from Wilberforce, Ohio, where they were classmates in college at Central State University, for the purpose of buying a substantial quantity of marijuana to be taken back to Wilberforce. They, subsequently, registered as guests in the Marriott Hotel on City Line Avenue, and eventually came in contact with the appellant, Cain, who told them he could obtain marijuana for them to purchase. Cain had no intention of arranging for the purchase of the marijuana and entered into a plan with others to rob Edwards and Green. Initially, the plan was to rob the victims in their hotel room. However, the plan was changed and then called for luring Edwards to a vacant small apartment building at 5129 Irving Street in Phila-

1. A motion in arrest of the judgments was filed, but was withdrawn by Cain's counsel at the time of oral argument on the motion for a new trial.

delphia, under the pretext of consummating the marijuana sale, where he would be forcedly relieved of his money.

About midnight on May 23, 1971, Cain and Lynn Williams accompanied Edwards from the Marriott Hotel to the Irving Street address where they were met by Calvin Williams and one Daniel Clark. The group entered one of the apartments in the vacant building and shortly thereafter Calvin Williams struggled with Edwards, and shot him in the head. The wound caused instant death. Calvin Williams then removed approximately $275.00 in cash from Edwards' clothing, after which the four felons fled the scene. Lynn Williams and Cain traveled together in the former's automobile. The four met later at the apartment of Lynn Williams with David Hunt, who had participated in the robbery plan, and divided the stolen money. Cain received $45.00 as his share.[2] Cain maintains certain errors occurred in the trial proceedings which were so prejudicial that a new trial is necessary.

## PART I

The first complaint concerns the refusal of the trial judge to permit the defense to introduce testimony of a psychiatrist, Dr. James Nelson. The circumstances are these.

Calvin Williams testified as a Commonwealth witness at Cain's trial. He told of being in Lynn Williams' apartment about 6 p. m. on May 23, 1971 and agreeing at the solicitation of David Hunt to participate in a robbery at the Marriott Hotel, and of the site of the robbery later being changed to an empty apartment building on Irving

2. Testifying in his own defense, Cain admitted being present when Edwards was robbed and killed. However, he denied any participation in either crime. Cain also admitted receiving $45.00 of the amount stolen from Edwards but said he accepted this money because he feared physical harm from Calvin Williams if he refused. However, when questioned by the police after his arrest, Cain admitted he participated in the plan to commit the robbery.

Street. He said when the intended victim of the robbery (Edwards) arrived at the apartment building on Irving Street, he was accompanied by Lynn Williams and by Cain, whom he (Calvin Williams) did not know and had not seen before. Williams said after the group entered an empty apartment on the first floor of the building, he grabbed and held Edwards because he thought he was carrying a gun and that when Edwards pulled away from his grasp, he shot him with a gun that had been given to him a short time before by Lynn Williams.

Calvin Williams also told of his stealing $275.00 from Edwards' clothing and of the subsequent meeting at Lynn Williams' apartment where the stolen money was divided. He said the group was disappointed that Edwards was not in possession of more money at the time of the robbery, and Cain suggested that they go to the Marriott Hotel and get the rest of the money Edwards was reported to have with him.

Calvin Williams also stated that at the time of the robbery and killing, he was "high" from the use of methedrine and during that particular period he was accustomed to taking fourteen or fifteen bags of heroin daily.

Calvin Williams further testified that on July 9, 1971, he was taken into police custody and shortly thereafter made a statement to the police detailing the relevant events of May 23 and May 24. He also admitted taking a capsule and a half of LSD about one hour before being taken into custody. However, Williams testified that he was not under the influence of any drugs at the time of Cain's trial in March, 1972,[3] and he stated his recollection of what happened at the time of the robbery and killing was clear and his trial testimony was based solely on this recollection.

3. Williams had been incarcerated continuously since his arrest and Cain's counsel conceded Williams was not under the influence of drugs at the time of Cain's trial.

In an attempt to impeach Williams' credibility, Cain attempted to introduce the testimony of Dr. Nelson, who, it was then stated by Cain's counsel, would express the opinion that as a result of the ingestion of LSD a short period of time before he was taken into custody, Williams could not on July 9, 1971, the date he made the statement to the police, accurately remember what occurred in the early morning of May 24, 1971, when the robbery and killing took place.[4] An objection to this testimony was sustained. Under the particular circumstances, the ruling was correct.

An offer of proof must be judged exclusively by its specific contents and the party advancing the offer is bound by the purpose stated. Cf. 1 Wigmore, Evidence § 17 (3d ed. 1940). Instantly, the record establishes that when the testimony of Dr. Nelson was offered at trial, its purpose was not to challenge Williams' credibility by showing he lacked ability to accurately remember or testify at trial, but rather its purpose and only purpose, as then stated, was to challenge his ability to remember and narrate to the police on July 9, 1971.[5] It is also clear,

---

4. Dr. Nelson never saw or examined Williams nor did he listen to his testimony at trial. Counsel indicated the witness' answers would be in response to hypothetical questions.

5. The purpose of the testimony when offered is demonstrated by the following from the trial record.

"Defense: It is our purpose in having Dr. Nelson testify today to qualify him as an expert, show his knowledge of the propensity and the effect of L.S.D. both physiologically and psychologically, and to show at that time that that witness was in no position to recollect with any degree of accuracy what occurred on May 24, 1971, at the time of the killing, and that at that time, when he made his statement to the police, he could not have differentiated fantasy from reality.

"D.A.: Is that your only purpose of putting Dr. Nelson on?

"Defense: Yes."

The purpose of the testimony at the time it was offered is further demonstrated by this colloquy which occurred between Cain's counsel and the court during the argument on the motion for a new trial.

"Judge Lipez: Pardon me for my interruption. You are in effect, are you not, attacking what he said when he gave the statement some months after the event?

from the record at Cain's trial, Williams was testifying solely from what he then remembered as to the circumstances and occurrences on the night of the crimes. Hence, the giving of the statement to the police about six weeks after the event was in no way related to his trial testimony. If the purpose of Dr. Nelson's testimony was to challenge Williams' credibility by showing that at the time of the event to which he testified his powers of observation and memory were impaired, so that as of the time of trial his recollection and account might be inaccurate (see *Commonwealth v. Gaddy,* 468 Pa. 303, 362 A.2d 217 (1976), and *Commonwealth v. Dreibelbis,* 217 Pa.Super. 257, 269 A.2d 387 (1970) ) a far different problem would be present. However, this was not the stated purpose of Dr. Nelson's testimony and the only purpose, as evidenced by the offer, was to attack Williams' ability to give an accurate statement to the police on July 9, 1971. Under the circumstances, the Doctor's testimony was irrelevant.

■ Presently in this appeal Cain's counsel states Dr. Nelson would also have testified that an individual who was taking heroin at the time of the event in the quantity Williams admitted would not then possess "the memory, perception and narrative ability" to ever accurately describe what occurred.[6] But this was not included in the offer of proof at trial and, as noted before, the ruling of the trial court must be evaluated by the contents of the offer at the time the offer was made.

## PART II

Cain next maintains a Commonwealth trial witness was permitted to testify to facts which the district attor-

"Defense: Yes sir.
"Judge Lipez: And not as to his recollection as to what happened on the day of the crime itself?
"Mr. Clarke: That's right."

6. The first time it was stated or indicated Dr. Nelson would so testify was in a supplemental brief filed in support of the motion for a new trial.

ney knew to be false because of a police report in his possession prior to trial. The factual background is this:

Cain was arrested on May 26, 1971, and gave a statement to the police, wherein he mentioned that "a white girl" called "Debbie" was with Lynn Williams on the night of the robbery and killing. Cain also mentioned this person in his testimony at trial. Efforts by the prosecution authorities to locate "Debbie" before Cain's trial began were unsuccessful, but while the trial was in progress she was located "through the drug underworld."

Debbie was called by the Commonwealth as a rebuttal witness and testified in relevant part as follows.

On the night of May 23, 1971, she was with her "boy friend," Lynn Williams, in his automobile when he drove to the Marriott Hotel "to pick up some money." After parking the vehicle outside the Marriott, Lynn Williams left for awhile and she waited in the vehicle. When Lynn returned he was accompanied by a man whom he introduced as "his cousin Gerry." [7] Lynn and "Gerry" entered the Williams' automobile and after a brief conversation both left the vehicle. The two returned shortly with three other men and all five entered the vehicle. The five then engaged in a conversation and talked about "holding somebody up" in the Marriott Hotel. Debbie was directed to accompany "Gerry" into the Marriott and proceed to a certain room (the room in which Edwards and Green were registered), to knock on the door and let "'Gerry' do the talking." During this conversation, Lynn Williams took a gun from the glove compartment and handed it to "Gerry" who placed it in his trousers. At this point, Debbie became frightened and asked Lynn Williams to take her home, but he refused. Debbie, Lynn Williams and "Gerry" then entered the Marriott and proceeded in the direction of the designated room, but Debbie managed to escape and flee from the

7. The appellant, Cain, was later determined to be "cousin Gerry."

hotel through a side exit. According to her testimony, Debbie than ran down a street outside the hotel and encountered a policeman in a police car and:

"I told him I was scared and there was going to be some shooting. He told me to get in the car and tried to calm me down. I got in the car and he asked me what I meant by shooting. I said, some guys up there, they have a gun, and I was scared and afraid it might be me."

She said she and the policeman then entered the lobby of the Marriott Hotel where he called a cab for her after contacting one of Debbie's friends by phone who promised to pay the cab fare.

Following the completion of Cain's trial, Officer Dudrick (the policeman Debbie met and talked with at the Marriott Hotel) testified in a proceeding involving Lynn Williams.[8] At this proceeding, Dudrick, a member of the Lower Merion Police Department, produced a report he prepared and filed with the department after his encounter with Debbie. The incident was described in this manner.

"While on routine patrol, I observed a girl running south on Presidential Boulevard toward Monument Road.

"The victim stated she was going to a party at the Marriott Motor Lodge with Lynn Willens [sic], a boy friend of the victim. She went to a room and observed six men. The girl got excited and ran out of the Marriott.

"Miss Weintraub was confused and admitted to having a nervous disorder.

"Communications contacted Curtis Macmillan of 4933 Walnut Street, Phila. Mr. Macmillan stated he would reimburse the United Cab Co. for the victim's

---

8. Officer Dudrick did not testify at Cain's trial.

transportation to his address. Victim was transported by United Cab Co." [9]

Cain's counsel later received a copy of the Dudrick departmental report. Cain's counsel now maintain, as they did at the time of argument on the new trial motion: (1) Debbie's trial testimony was false and the district attorney knew it was false because of its inconsistency with Officer Dudrick's report; [10] (2) the district attorney was guilty of suppressing exculpatory evidence in not making a copy of the Dudrick report available at Cain's trial; (3) the district attorney was guilty of secreting evidence from the defense which could have been used in the cross-examination of Debbie to impeach her credibility.

■■ The first contention can be dismissed without extended discussion. It is unquestionably true that the prosecution may not knowingly use false testimony to achieve a conviction. *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). But there is nothing in the record to warrant the conclusion or assertion that Debbie's trial testimony was false or inconsistent with what she told Officer Dudrick. It is true that Debbie's trial testimony was more extensive than what she reportedly told Officer Dudrick, as evidenced by his departmental report, but it does not necessarily follow the two were inconsistent. Moreover, a close reading of the report indicates it was less than a comprehensive summary of the details of the incident and what Debbie said to the officer.

9. In the proceeding involving Lynn Williams, Officer Dudrick described Debbie in this way at the time involved:
". . . she was confused, incoherent . . .."
\* \* \* \* \* \* \* \* \* \*
"Well she started talking to me, and it was so fast and incoherent I tried to settle her down so I could get some information and find out what the problem was."

10. In his brief, Cain's counsel alleges the district attorney had knowledge of this report before Debbie was called to testify at Cain's trial. Since the district attorney has not denied this, we accept it as true for present purposes.

■ We recognize that the prosecution may not knowingly or negligently suppress evidence which is exculpatory. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Further, when the reliability of a given witness is critical to a determination of guilt or innocence nondisclosure of evidence affecting credibility falls within the *Brady* rule. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *United States v. Keogh,* 391 F.2d 138 (2d Cir. 1968). However, we are not convinced the situation instantly falls within the *Brady* proscriptions for the reasons that follow.

■■■ In addition to the fact that the police report contained no exculpatory information, it is significant to note that the report does not appear to be a statement by Miss Weintraub and could not be used as such to impeach her testimony. Although the general rule in Pennsylvania is that relevant pretrial statements of witnesses in possession of the Commonwealth must be made available to the accused upon request during the trial, *Commonwealth v. Kontos,* 442 Pa. 343, 276 A.2d 830 (1971), its application has not been expanded beyond the verbatim notes of a victim's statements made by an investigating officer. *Commonwealth v. Morris,* 444 Pa. 364, 281 A.2d 851 (1971). The distinction between a report that is a verbatim, signed, or adopted recordation of a witness' statement and an imprecise summary of what another understood him to say has been recognized in both federal and state cases. See, e. g., *Campbell v. United States,* 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); *Palermo v. United States,* 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed. 2d 1287 (1959); *State v. Houston,* 209 N.W.2d 42 (Iowa 1973); *Wright v. State,* 501 P.2d 1360 (Alaska 1972); *People v. Dennis,* 47 Ill.2d 120, 265 N.E. 2d 385 (1970); *Ramer v. State,* 40 Wis.2d 79, 161 N.W. 2d 209 (1968). The rationale behind this distinction is that it is unfair to allow the defense to use statements to

impeach a witness which cannot fairly be said to be the witness' own rather than the product of the investigator's selection, interpretation, and recollection. In the instant case there is no evidence that Debbie signed or adopted the police report or that it was a verbatim recordation of a continuous narrative statement made by her.

We note this additionally. After Debbie was taken into custody, she gave a statement to the district attorney concerning the events of May 23, 1971, which comported with her trial testimony. A copy of this statement was given to Cain's counsel before Debbie was called to testify. Also, Cain's counsel were given the opportunity by the Commonwealth to interview Debbie before she testified. Finally, during Debbie's testimony in which the circumstances of her encounter with Officer Dudrick were explored at length, the luncheon recess intervened but there was no effort by Cain's counsel to subpoena Officer Dudrick or to ascertain if he had made a report (a public record) of the incident involved. Again, although the trial continued for several days after Debbie's testimony concluded, Cain's counsel made no attempt to interview Officer Dudrick or acquire a copy of the departmental report. As we pointed out in *Commonwealth v. Carter*, 427 Pa. 53, 54, 233 A.2d 284, 285 (1967), the prosecution need not advise the defense it has additional witnesses, ". . . if the defense is able or should have been able to procure the witness unaided."

## PART III

Cain next complains the trial judge committed error in permitting testimony relating to oral admissions made to a polygraph operator. The first thing which must be made clear is the oral admissions did not come as a result of the test or were not made during the test, they were made before the actual test was administered, and before the polygraph apparatus was connected to the accused.

The facts are as follows: The Commonwealth sought to introduce the testimony of Sergeant Gallagher, a Philadelphia police officer, who was a polygraph operator. Cain had made some oral inculpatory admissions to this officer during what is called the "pretest interview." This all took place before the test was administered and before Cain was connected to the machine. The officer was attempting to get some background information on the accused to determine if the test should be given and the format of the questions.

The defense objected to this officer testifying about anything said to him because he was a polygraph operator. The district attorney stipulated in an *in camera* hearing the officer would make no mention of the polygraph test on direct examination, and would say nothing on cross-examination unless directly asked if he gave a polygraph test. The district attorney stated the witness would only testify about the information gained in the time prior to the polygraph test. On direct the officer said nothing at all about the test, and there was nothing which gave rise to the inference a test was given; however, on cross-examination the defense explicitly asked the officer what kind of examination he gave the accused. Now Cain complains it was error to permit the officer to testify at all.

 The rule in Pennsylvania is that reference to a lie detector test or the result thereof which raises inferences concerning the guilt or innocence of a defendant is inadmissible. See *Commonwealth v. Johnson*, 441 Pa. 237, 272 A.2d 467 (1971); *Commonwealth v. Saunders*, 386 Pa. 149, 125 A.2d 442 (1956); *Commonwealth ex rel. Hunter v. Banmiller*, 194 Pa.Super. 448, 169 A.2d 347 (1961); *Commonwealth v. McKinley*, 181 Pa.Super. 610, 123 A.2d 735 (1956). This rule was established to protect the defendant in a criminal trial and it is based on this Court's refusal to recognize the scientific accuracy or validity of such tests. However, the instant case does

not fall within the prohibition of this line of cases. Here Cain's counsel raised the fact the officer gained the inculpatory information while asking questions before the polygraph test. The Commonwealth had stipulated the officer would say nothing about the test, and under the instant facts there was no need to bring to the attention of the jury a polygraph test was administered, since the testimony of the officer did not involve the actual test. When the defendant himself brings forth the fact that a polygraph test was given, he cannot later be heard to complain the jury was made aware of the test, for the error, if any, rests squarely on his shoulders.[11] To hold otherwise would be to say a police officer who is a polygraph operator could not testify about any information gained when he is acting in the capacity of an officer involved in the general investigation of a crime.

## PART IV

Cain's next complaint is that the trial court erred in refusing to charge the jury on voluntary manslaughter as requested by his counsel. Initially, we note that no evidence was presented at trial to support such a verdict and it is not argued such evidence was presented. Furthermore, Cain's trial was held in March of 1972, and thus, antedated this Court's ruling in *Commonwealth v. Jones*, 457 Pa. 563, 319 A.2d 142 (1974) [Hereinafter *Jones*] wherein, pursuant to our supervisory powers, we abolished the practice of allowing our trial courts complete discretion in determining whether to charge a jury on voluntary manslaughter, where no evidence existed to support such a verdict.[12] Subsequent to *Jones*, the Unit-

11. The following cases stand for the proposition that if a criminal defendant introduces objectionable evidence himself, he may not later complain about its admissibility. Cf. *United States v. McQueen*, 458 F.2d 1049 (3d Cir. 1972); *United States v. Higgins*, 458 F.2d 461 (3d Cir. 1972); *Commonwealth v. Dessus*, 214 Pa.Super. 347, 257 A.2d 867 (1969); *Commonwealth v. Ford*, 193 Pa.Super. 588, 165 A.2d 113 (1960).

12. We announced that in all trials beginning thereafter, the court would be required, if requested, to instruct the jury on voluntary

ed States Court of Appeals for the Third Circuit ruled that the practice abolished in *Jones* was violative of the due process clause of the Fourteenth Amendment to the United States Constitution.[13] *United States ex rel. Matthews v. Johnson*, 503 F.2d 339 (3d Cir. 1974) [Hereinafter: *Matthews*.] As such, Cain's trial also antedated *Matthews*. Thus, the instant issue requires resolution of two important questions:

(1) Do federal constitutional considerations mandate the application of *Matthews* to cases on direct appeal where the trial antedated both *Jones* and *Matthews*? [14]

(2) If federal constitutional considerations do not mandate the application of *Matthews* to such cases, should we, pursuant to our supervisory powers, apply *Matthews*, in this context more precisely *Jones*, to such cases?

In order to properly resolve these questions discussion of the relevant body of case law is required and helpful because it reveals the rationale of *Matthews* and *Jones* and because it provides considerable scholarship in making the resolution. Discussion of the purpose and of the rationale of *Matthews* and *Jones* is, of course, essential to the resolution and the scholarship is helpful in that it provides guidance in making our resolution.

In determining the practice under Pennsylvania law prior to *Jones* was unconstitutional, the Third Circuit

---

manslaughter even in the absence of evidence in the record to support such a verdict. The Court was divided as to the reasons why such an instruction was required. Mr. Justice Nix, Mr. Justice O'Brien and the writer favored the change in order to establish a uniform and consistent practice. Mr. Justice Roberts, in an opinion joined by Mr. Justice Pomeroy and Mr. Justice Manderino expressed the belief that the prior practice was unconstitutional. Thus, the new rule was a result of this Court's supervisory powers.

13. Since this Court did not express a decisional view on the constitutional issue in *Jones*, supra n. 12, the Third Circuit determined it was necessary to review the question.

14. Cases tried prior to *Matthews*, but subsequent to *Jones* are clearly controlled by *Jones*.

reasoned that since a jury had the inherent power to return a voluntary manslaughter verdict on a murder indictment in Pennsylvania, the lack of standards for our trial courts to determine whether to charge the jury on voluntary manslaughter resulted in a fundamentally unfair practice because every accused was subject to the " 'whim and caprice' of a given judge on a given day." *Matthews,* supra at 346, quoting from *Commonwealth v. Matthews,* 446 Pa. 65, 285 A.2d 510 (1971) (Dissenting Opinion, Pomeroy, J.) As a result, the rule announced in *Jones* was determined to be constitutionally required. *Matthews,* supra.

In *Matthews,* supra at 347, Judges Aldisert, Rosenn, and Weis expressed the view that the ruling therein was not to be applied wholly retroactively, but that it was to be applied to cases on direct appeal in accordance with *United States v. Zirpolo,* 450 F.2d 424 (3d Cir. 1971) [Hereinafter: *Zirpolo*].[15] Those judges stated:

> "[the rule] should apply . . . . to . . . . cases in which a jury instruction for voluntary manslaughter was properly and timely requested and if trials have been completed, are on direct appeal in the Pennsylvania courts on this date."

*Matthews,* supra at 348–49. Subsequently, in *United States ex rel. Cannon v. Johnson,* 536 F.2d 1013 (3d Cir. 1976) [Hereinafter: *Cannon*], a panel decision, the panel unanimously stated that *Matthews* did not apply to cases still on direct appeal, but rather, applied only to cases in which the trial commenced subsequent to *Matthews.* The panel was composed of Judges Van Dusen, Kalodner, and Weis. Judge Weis filed a concurring opinion in which he explained that the reason for having changed his position with regard to cases on direct ap-

---

**15.** Judge Kalodner dissented and the remaining six judges declined to express any view on the point.

peal was the intervening decision in *Daniel v. Louisiana,*
420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975) [Here-
inafter: *Daniel*].[16] *Cannon* affirmed the decision of the
United States District Court for the Eastern District of
Pennsylvania, *United States ex rel. Cannon v. Johnson,*
396 F.Supp. 1362 (E.D.Pa.1975) [Hereinafter: *Dist.
Cannon*], as to retroactivity in collateral attacks and fol-
lowed, in dictum,[17] the district court's suggestion that
*Matthews* not be applied to cases on direct appeal as
*Matthews* had suggested. The panel in *Cannon* also rec-
ognized that *Zirpolo* was in conflict with *Daniel.*

Thus, insofar as the Third Circuit Court has expressed
itself: three judges would not apply *Matthews* to cases
on direct appeal; two judges have expressed the view
that they would, but expressed this view prior to *Daniel*;
and the remaining five judges have not expressed a view.
Additionally, Judge Becker, with whom Judge Ditter
joined, in *Dist. Cannon* strongly suggested *Matthews*
should not be applied to cases on direct appeal and did so
at a time when the only view expressed by the Third Cir-
cuit was that *Matthews* should be applied to cases on di-
rect appeal.

Under such circumstances, we should not feel con-
strained to follow either view expressed by the judges of
the Third Circuit, but if either view is to be given more

16. *Daniel* ruled that *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct.
692, 42 L.Ed.2d 690 (1975) which ruled a certain method of select-
ing petit juries was violative of the Sixth and Fourteenth Amend-
ments, applied only to trials commenced after the decision in
*Taylor* was announced.

17. Although as to direct appeals the *Cannon* ruling was dictum,
in the interest of certainty and following the lead of the Supreme
Court of the United States, many courts announce the effective
date of decisions for purposes of collateral attack and direct re-
view either when the new rule is set forth or in the first case in
which the effective date of the new rule is at issue, whether the
case be a collateral attack or a case on direct review. See, e. g.,
*Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199
(1967); *Commonwealth v. Godfrey,* 434 Pa. 532, 254 A.2d 923
(1969).

weight, it is the view of *Cannon*, that is, *Matthews* is not applicable to cases on direct appeal, because:

(1) it represents the Third Circuit Court's most recent expression on the subject;

(2) it represents a view which had the benefit of *Daniel* which is in conflict with *Zirpolo*;

(3) although it is only a panel decision, Rule 35 of the Rules of Appellate Procedure, 28 U.S.C.A. Rule 35, provides a procedure whereby a majority of the Third Circuit could have *sua sponte* caused a rehearing by the court *en banc* had a majority thought the proceeding in *Cannon* involved a "question of exceptional importance" or had "consideration by the full court [been thought] necessary to secure or maintain uniformity of its decisions." 28 U.S.C.A. Rule 35. In light of *Zirpolo* being impliedly overruled by *Cannon*, it is difficult to imagine a more appropriate case requiring uniformity. Yet, no rehearing *en banc* was ordered; and,[18]

(4) it presents a complete understanding of both the purpose to be served by charging the jury on voluntary manslaughter absent evidence to support such a

18. In addition to the problems of uniformity presented by *Cannon* and *Zirpolo*, the Third Circuit could hardly have been unmindful of the "exceptional importance" of this question to Pennsylvania law since Judge Becker's opinion in *Dist. Cannon* set forth a thorough statistical analysis, which included an appendix tracing the Supreme Court's decisions on retroactivity for over twelve years in order to justify his suggestion that was contrary to the view expressed in *Matthews*. Moreover, *Matthews* stated at least for three Circuit Judges, Aldisert, Rosenn and Weis, that the resolution of the retroactivity issue presented "potential pervasive ramifications." 503 F.2d at 346; and, two other Circuit Judges, Van Dusen and Kalodner, considered the issue as presenting sufficient ramifications for Pennsylvania law to necessitate addressing the issue in dictum in *Cannon*. It is thus apparent that one half of the Third Circuit considered the issue in *Cannon* as presenting a question of importance. Therefore, the failure of the Third Circuit to exercise its prerogative under Rule 35 to cause a rehearing *en banc* weighs heavily in accepting the view of *Cannon* as that of the Third Circuit.

verdict and the considerations and ramifications of applying *Matthews* to direct appeals.[19]

With this background in mind and affording appropriate weight to the views of the Third Circuit, we shall now discuss the two questions which we earlier indicated require resolution.

 Since *Matthews* announced a new rule of criminal procedure, namely, it is constitutionally required that the charge of voluntary manslaughter be given in all trials on a murder indictment in Pennsylvania because no standards for the exercise of the trial court's discretion in determining whether to give the charge had been set forth by this Court, *Matthews,* supra at 347 n. 24; *Cannon,* supra at 1013; *Dist. Cannon,* supra at 1362, a proper determination of whether *Matthews* must be applied to cases tried prior to *Jones,* but for which the availability of appellate review has not been exhausted, requires a consideration of three factors:

"(a) the purpose to be served by the new standards;

"(b) the extent of the reliance by law enforcement authorities on the old standards; and

"(c) the effect on the administration of justice of a retroactive application of the new standards."

*Matthews,* supra at 347–8, quoting from *Zirpolo,* supra at 431–32; *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) [Hereinafter: *Linkletter*]. Moreover, as the Third Circuit has stated:

"[w]e must, however, stress the specific holding of *Desist v. United States,* 384 U.S. 244, 249, 89 S.Ct. 1030, 1033, 22 L.Ed.2d 248 (1969), that *'foremost'* consideration should be given 'to the purpose to be served *by the new constitutional rule,'* and the later holding

19. As previously noted, the *Cannon* panel and the Third Circuit pursuant to Rule 35 had the benefit of a complete and thorough analysis of the facts and law as set forth in the scholarly opinion of Judge Becker in *Dist. Cannon.*

of *Williams v. United States*, 401 U.S. 646, 653, 91 S. Ct. 1148, 1152, 28 L.Ed.2d 388 (1971), that retroactivity should be accorded '[w]*here the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function* and so raises serious questions about the accuracy of guilty verdicts in past trials. . . .' "

*Cannon,* supra at 1016. [Emphasis in original.] Furthermore, these same principles must be utilized whether a new constitutional rule and its retroactive application are being considered in the context of a collateral attack or of a case on direct appeal. *Michigan v. Payne,* 412 U.S. 47, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1973).

With regard to the purpose of the ruling, *Matthews* quite clearly sought the "elimination of unseemly arbitrariness from the judicial process." [20] The rule

"does not go to the jury's ability to determine the presence *vel non* of the elements of the crime but rather to the jury's ability to exercise its 'historically recognized mercy dispensing power.' "

*Matthews,* supra at 348, quoting *Jones,* supra at 149. Furthermore, the rule announced in *Matthews* rather than aiding the trial's "truth-finding function" actually impairs it because

"the effect . . . is to allow (all) juries to bring in manslaughter verdicts, regardless of the evidence, for reasons of sympathy or otherwise."

*Dist. Cannon,* supra at 1367. As such, the first factor of the *Linkletter* test and the "foremost" consideration set forth in *Williams v. United States,* supra, weigh heavily against application of the *Matthews* rule to cases on direct appeal.

**20.** As Mr. Justice Nix stated in *Jones,* from the point of view of the exercise of this Court's supervisory powers, the rule's purpose is to establish consistency. *Jones,* supra, 457 Pa. at 573, 319 A.2d 142.

With regard to the reliance of law enforcement authorities on the old standard, the Commonwealth has undoubtedly relied heavily on the old rule in seeking to have our courts exercise their complete discretion in not charging on voluntary manslaughter absent evidence to support such a verdict. See *Jones* and *Dist. Cannon* which indicate reliance for over a century, as well as *Cannon* which agreed with *Dist. Cannon's* analysis.

With regard to the effect on the administration of justice, little purpose would be served in recounting the number of new trials that would be required, since the district court in *Dist. Cannon* thoroughly analyzed the problem and concluded that

> *"any type of retroactive application of Matthews* would have *a substantial adverse effect* upon the administration of justice in Pennsylvania."* [Emphasis added.]

*Dist. Cannon,* supra at 1371. Furthermore, we share the concern, expressed by the district court in *Dist. Cannon,* about the effect on the numerous appeals allowed *nunc pro tunc* in Pennsylvania, were we to apply *Matthews* to cases on direct appeal. Furthermore, since the rule in *Matthews* does nothing to advance the truth-finding process, little justification, if any, exists to place such a horrendous burden on our courts and the Commonwealth.

Finally, as to the vitality of the alleged distinction between collateral attacks and direct appeal cases, the Supreme Court of the United States stated in *Stovall v. Denno,* supra, 388 U.S. at 300–301, 87 S.Ct. at 1972:[21]

> "We also conclude that, for these purposes, *no distinction is justified between convictions now final, as in*

---

**21.** As to the consistency with which the United States Supreme Court has now followed this view, the Third Circuit stated in *Cannon:*

"The Supreme Court, since Johnson v. New Jersey, supra, has for the most part made prospective from the date of its announcement, a new criminal procedural rule which does not implicate the truth-finding process of a trial."

*the instant case, and convictions at various stages of trial and direct review.* We regard the factors of reliance and burden on the administration of justice as entitled to such overriding significance as to make that distinction unsupportable." [Footnoting: Shaefer, The Control of 'Sunbursts': Techniques of Prospective Overruling, 22 Record of N.Y.C.B.A. 394, 408–11 (1967) ]. [Emphasis added.]

Thus, since the purpose of *Matthews* is not to enhance the truth-finding process, since considerable reliance by the Commonwealth is present, since a horrendous burden would be placed on the administration of justice were we to apply *Matthews* to cases on direct review, and since the Third Circuit has ruled *Matthews* need not be applied to collateral attacks and no distinction as to cases on direct appeal is justified, it is clear that federal constitutional considerations do not mandate the application of *Matthews* to cases on direct review. There remains the question of whether we should apply *Matthews* to cases on direct appeal pursuant to our supervisory powers. For the following reasons, we should decline to do so.

First, we have applied new rules of procedure in a wholly prospective manner in numerous cases and, therefore, the concept is not foreign to Pennsylvania jurisprudence. See, e. g., *Commonwealth v. Geiger*, 455 Pa. 420, 316 A.2d 881 (1974) ; *Commonwealth v. Hayward*, 437 Pa. 215, 263 A.2d 330 (1970) ; *Commonwealth v. Godfrey*, 434 Pa. 532, 254 A.2d 923 (1969) [Hereinafter: *Godfrey*] ; *Commonwealth v. Jordan*, 407 Pa. 575, 181 A.2d 310 (1962).

[Footnoting: *Stovall v. Denno,* supra; *DeStefano v. Woods,* 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968); *Fuller v. Alaska,* 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968); *Desist v. United States,* supra; *Halliday v. United States,* 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (1969); *Williams v. United States,* supra; *Mackey v. United States,* 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971); *Adams v. Illinois,* 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed. 2d 202 (1972).] And see, *Daniel v. Louisiana,* supra.

Second, when we announced the new rule of *Matthews* in *Jones,* pursuant to our supervisory powers, Jones was not given the benefit of the new rule despite the fact that he raised the question on direct appeal.[22] Thus, the propriety of applying *Matthews* to cases now on direct appeal pursuant to the same supervisory power exercised in *Jones* is open to serious question. Moreover, the fact that the *Jones* decision was given constitutional dimension by *Matthews* does not affect our supervisory determination because (1) the rule of *Matthews,* whether constitutional or not, is still procedural and does not affect the truth-finding function; and, (2) constitutional considerations as discussed previously do not mandate a different determination than that made in *Jones.*

Third, we have definitely adopted the *Linkletter* standards for making a determination if a new rule of criminal procedure having constitutional dimension is to be applied retroactively or prospectively, see, e. g., *Commonwealth v. Little,* 432 Pa. 256, 248 A.2d 32 (1968), and consistency demands its progeny be followed, i. e., *Stovall v. Denno,* supra; *Johnson v. New Jersey,* supra; and *Daniel,* absent a compelling reason to apply different

**22.** Although *Jones* lacks precedential value because it represents only the views of three members of this Court, even accepting the view that the *Jones* rule is constitutionally required as established by *Matthews,* the constitutional considerations do not require application of *Matthews* to cases on direct appeal. Furthermore, the considerations set forth in n. 3 of the Opinion in Support of Reversal in *Jones* in support of applying the rule to Jones are not now applicable. The first consideration was that announcing a new rule and not applying it to Jones constituted dictum. That consideration is not now present because this Court is not now announcing a new rule. The second consideration was that wholly prospective rulings remove the incentive to appeal. Again that consideration is inapplicable instantly because the issue raised on appeal by Cain must now be ruled upon. Finally, a state court exercising supervisory powers in promulgating rules of procedure need be less concerned with dictum than a federal court ruling on constitutional matters effecting state law because in that context federal courts have no supervisory powers and are bound by Article III of the federal constitution. *Stovall v. Denno,* supra. The principle, of course, is inapplicable with regard to substantive matters before state courts.

standards. No compelling reason has been called to our attention and we know of none. Furthermore, our prior decisions indicate clearly that, absent an effect on the truth-finding process, new rules of criminal procedure are not to be applied to cases on direct review. Supra at n. 21.

As a corollary to this principle, cases wherein we have applied new rules of criminal procedure having constitutional dimension to direct appeals have normally involved rules affecting the validity of the truth-finding process. See, e. g., *Commonwealth v. Dravecz,* 424 Pa. 582, 227 A.2d 904 (1967) and *Commonwealth v. Little,* supra. This is not to suggest that some inconsistency does not exist. See, e. g., *Commonwealth v. Linde,* 448 Pa. 230, 293 A.2d 62 (1972). But *Linde,* supra, merely followed *Linkletter* and it is *Linkletter's* progeny from which the above stated principle can now be gained.

Fourth, persuasive and controlling precedent exists in Pennsylvania for applying *Matthews* only where the trial commenced after the entry of that decision. In *Commonwealth ex rel. West v. Rundle,* 428 Pa. 102, 237 A.2d 196 (1968) [Hereinafter: *West*], we set forth new standards for an on-the-record examination before accepting an accused's guilty plea, which is obviously procedural, as is the *Matthews* rule. In *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1974) [Hereinafter: *Boykin*], the rule and requirement we previously announced was given constitutional dimension. But *Boykin* was not made retroactive and in *Godfrey,* supra, we ruled *Boykin,* supra, was to be applied wholly prospectively, that is, from the date of the *Boykin* decision. In accord, *United States ex rel. Hughes v. Rundle,* 419 F.2d 116, 118 (3d Cir. 1969).

Thus, that situation presented us with a new rule of procedure announced by us pursuant to our supervisory powers, *West,* supra, which was given constitutional dimension, *Boykin,* supra, and which did not affect the

truth-finding process, and we decided the rule of procedure was to be applied wholly prospectively, *Godfrey,* supra, that is, to trials begun after the date of *West,* supra; *Boykin,* supra, notwithstanding. Instantly, we are confronted with a new rule of procedure announced by us pursuant to our supervisory powers, *Jones,* which was given constitutional dimension, *Matthews,* and which does not affect the truth-finding process, *Matthews; Cannon; Dist. Cannon; Jones,* and thus, as with *Boykin,* supra, *Matthews* should apply wholly prospectively, that is, to trials begun after the date of *Jones; Matthews* notwithstanding.

Accordingly neither *Jones* nor *Matthews* is applicable if the trial was concluded prior to the date of our decision in *Jones.*

In sum, a studied consideration of the record demonstrates Cain received a fair trial and none of his complaints warrant upsetting the jury's findings. The judgments should be affirmed.

JONES, C. J., and POMEROY, J., join in this opinion.

## OPINION IN SUPPORT OF AFFIRMANCE

POMEROY, Justice.

I join in Mr. Justice Eagen's Opinion in Support of Affirmance. This supplemental opinion is written merely to note in short compass my position relative to Part IV thereof, the manslaughter charge question.

The main concern of Part IV of Mr. Justice Eagen's opinion, of course, is not the basic question of the constitutional nature of the requirement; that result is assumed and accepted [1] by reason of the decision of the

1. It is gratifying to observe that a majority, at least, of the Court now acknowledges that the giving of a charge on voluntary manslaughter, when requested by the defendant, even in the absence of evidence of that crime, is required by the due process clause of the United States Constitution. This result comports fully

United States Court of Appeals for the Third Circuit in *United States ex rel. Matthews v. Johnson,* 503 F.2d 339 (3d Cir. 1974) ("Matthews"). See Mr. Justice Eagen's opinion at 1244–1245. While the Supreme Court of Pennsylvania had previously arrived at the same result as the Third Circuit, we were divided as to whether that result was constitutionally compelled, or was merely an exercise of this Court's supervisory powers. See *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974) ("Jones"). The teaching of *Matthews* was that due process of law required the giving of a charge on manslaughter in any case where a defendant charged with murder requests it, even in the absence of evidence of manslaughter.[2] Recognizing that teaching, the Opinion in Support of Affirmance by Mr. Justice Eagen is concerned primarily with the applicability thereof to cases, such as this one, tried before either the opinion of this Court in *Jones* or the opinion of the Third Circuit in

with views I have heretofore expressed in dissent, starting with *Commonwealth v. Matthews,* 446 Pa. 65, 80, 295 A.2d 510, 516 (1971) (dissenting opinion of Pomeroy, J., joined by Roberts, J.); *id.* at 78 (dissenting opinion of Roberts, J., joined by Pomeroy, J.). See also *Commonwealth v. Banks,* 447 Pa. 356, 364, 285 A.2d 506, 509 (1972) (dissenting opinion of Pomeroy, J., joined by Roberts, J.); *Commonwealth v. Cannon,* 453 Pa. 389, 400, 309 A.2d 384, 390 (dissenting opinion of Pomeroy, J.); *Commonwealth v. Jones,* 457 Pa. 563, 577, 319 A.2d 142, 150 (1974) (Opinion in Support of Reversal) (opinion of Roberts, J., joined by Pomeroy and Manderino, JJ.). The views expressed in the Opinion in Support of Reversal in *Jones* are consistent with Part I of Mr. Justice Roberts' Opinion in Support of Reversal, *infra* at pp. 1251–1255, in the case at bar. These views continue to represent my own conviction save for the problem, dealt with in the main text, of the applicability of the rule to the instant appellant.

2. Noting that whether a jury could exercise its mercy dispensing power to return a voluntary manslaughter verdict as a lesser included offense of a murder indictment, depended on whether or not the trial judge charged on the point, the Court of Appeals in *Matthews, supra,* held:

"[T]he safeguards of due process will be satisfied only when all defendants in Pennsylvania murder trials are given the same opportunity, upon request duly made, to have a jury return a verdict of voluntary manslaughter as well as first and second degree murder." *Matthews,* 503 F.2d at 346.

*Matthews* were announced.[3] That is a question of no little difficulty. Mr. Justice Eagen concludes that neither *Jones* nor *Matthews* applies to a trial which preceded our decision in *Jones*. The purpose of this separate opinion is merely to set forth as succinctly as I can why I am now satisfied that this result is correct.

The key to the matter is the position of the Third Circuit Court of Appeals and the Supreme Court of the United States by which we are, of course, bound as to matters of federal constitutional law.[4] While, as Mr. Justice Roberts points out, it lies within our power to interpret our state due process clause more liberally than the federal courts interpret the federal clause, I think that generally it is jurisprudentially unwise to do so, at least where the Supreme Court of the United States has spoken. See, e. g., *Commonwealth v. Triplett*, 462 Pa. 244, 249, 253, 341 A.2d 62 (1975) (concurring opinion by Pomeroy, J.); *Commonwealth v. Campana*, 455 Pa. 622, 628, 314 A.2d 854, 857 (1974) (dissenting opinion by Pomeroy, J.), *cert. denied*, 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974).

Because of the views on retroactivity of the three judges on the *Matthews* court who spoke on that subject, one might expect that, when the occasion arose, that court, following its own precedent in *United States v. Zirpolo*, 450 F.2d 424 (3d Cir. 1971), would apply its new holding to cases which, if trials have been completed, "are on direct appeal in the Pennsylvania courts on this date" (August 15, 1974). See *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). This would have been in accord with the views of those

3. *Jones* and *Matthews* were both decided in 1974, *Jones* preceding *Matthews*; the trial of Gerald Cain took place in 1971.

4. *Commonwealth v. Ware*, 446 Pa. 52, 284 A.2d 700, cert. denied, 406 U.S. 910, 92 S.Ct. 1606, 31 L.Ed. 821 (1971); *Commonwealth v. Williams*, 432 Pa. 557, 568 n*, 248 A.2d 301, 307 n. 8 (1968). See also *Commonwealth v. Negri*, 419 Pa. 117, 213 A.2d 670 (1965).

who subscribed to the Opinion in Support of Reversal in *Jones,* see 457 Pa. at 577, 319 A.2d 142, and in my opinion had much to commend it; if a constitutional principle has been offended, similarly situated defendants should normally be treated the same unless, in Mr. Justice Harlan's phrase, there is "a principled reason for acing differently." *Desist v. United States,* 394 U.S. 244, 258, 89 S.Ct. 1030, 1038, 22 L.Ed.2d 248, 268 (1969) (Harlan, J. dissenting). But in the meantime, between the date of the *Matthews* decision and the time when the Court of Appeals for the Third Circuit next addressed the question, in *United States ex rel. Cannon v. Johnson,* 536 F.2d 1013 (3d Cir. 1976), the Supreme Court of the United States rendered its decision in *Daniel v. Louisiana,* 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975) ("Daniel"). *Daniel,* like *Zirpolo,* involved the applicability of a holding that a state's method of selection of petit juries violated the Sixth and Fourteenth Amendments. Whereas *Zirpolo* had applied such a holding to cases "on direct appeal", the Supreme Court in *Daniel* held that its prior similar holding (in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)) was not to be applied retroactively, as a matter of federal law, to convictions obtained by juries empaneled prior to the date of that decision. As the Court of Appeals observed in *Cannon,* "the stated holding in *Daniel* is in sharp contrast with our [the Court of Appeals'] action in [*Zirpolo*] . . ." 536 F.2d at 1017. This holding in *Daniel* caused Judge Weis, who sat as a member of the *Cannon* panel and was also one of the three judges who in *Matthews* expressed the view that the retroactivity issue should be met and decided on the basis of *Zirpolo,* to join with his colleagues in holding that *Matthews* should have a wholly prospective application. The reason for the change of position adopted by Judge Weis is the reason for my vote in the case at bar. I venture to believe it is a "principled reason." The purpose of *Matthews* was to

eliminate arbitrariness in trial procedure; it was not designed to enhance the reliability of the factfinding process. Similarly, as the Supreme Court stated in *Daniel,* its concern in *Taylor v. Louisiana, supra,* had been with the function of the jury in "preventing arbitrariness and repression"; the decision "did not rest on the premise that every criminal trial, or any particular trial, was necessarily unfair because it was not conducted in accordance with . . . the requirements of the Sixth Amendment." *Daniel, supra,* 420 U.S. at 32, 95 S.Ct. at 705, 42 L.Ed.2d at 793.

## OPINION IN SUPPORT OF REVERSAL [1]

ROBERTS, Justice.

In this murder trial, where there was no evidence of mitigating circumstances which would reduce the crime from murder to manslaughter, appellant submitted a point for charge on voluntary manslaughter. The trial court refused this point and its charge to the jury omitted any reference to voluntary manslaughter as a permissible verdict. Appellant took specific exception to the trial court's failure to charge on voluntary manslaughter. In post-trial motions and on appeal, appellant asserts that this omission was error requiring a new trial. I agree.

This Court last addressed the issue of the right to a requested instruction on voluntary manslaughter, where there is no evidence of voluntary manslaughter, in *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974). In *Jones,* all six Justices who participated agreed that after the date that *Jones* was filed a trial court must give a requested charge on voluntary manslaughter, even though there is no evidence of voluntary manslaughter.

---

1. This Court, being equally divided, affirms appellant's conviction despite the trial court's denial of his request for a voluntary manslaughter charge.

Two opinions were filed. The Opinion in Support of Affirmance reasoned that this Court, pursuant to its supervisory power, should adopt the "rule that henceforth a defendant under indictment of murder will be entitled, *upon request,* to have the jury advised of its power to return a verdict of voluntary manslaughter." 457 Pa. at 573–74, 319 A.2d at 148 (emphasis in original). The Opinion in Support of Reversal asserted that the failure to give a requested charge on voluntary manslaughter worked a deprivation of due process and equal protection in view of the jury's unquestioned power in all murder prosecutions to return a voluntary manslaughter verdict. 457 Pa. at 577, 319 A.2d at 150. This Court, being equally divided, affirmed Jones' conviction despite the trial court's denial of his request for a voluntary manslaughter charge.[2]

After our decision in *Jones* the United States Court of Appeals for the Third Circuit, ten judges sitting en banc, concluded over a single dissent (Kalodner, J.), that Pennsylvania's pre-*Jones* practice violates the due process rights of a defendant on trial for murder. *United States ex rel. Matthews v. Johnson,* 503 F.2d 339 (3d Cir. 1974), cert. denied, 420 U.S. 952, 95 S.Ct. 1336, 43 L.Ed.2d 430 (1975).

Today we must decide, in light of *Matthews,* if a defendant whose conviction was on direct appeal at the time of that decision is entitled to a requested voluntary manslaughter instruction. I conclude that due process requires that the requested instruction be given, and that this right applies to appellant. A defendant's due pro-

---

2. In *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974), the Opinion in Support of Affirmance did not apply the rule prospectively:

> "The benefit of the rule . . . is plainly applied to the instant appellant. But relief is denied on what is a novel articulation of the harmless error theory."

Id. (Opinion in Support of Reversal) (Opinion of Roberts, J., joined by Pomeroy and Manderino, JJ.) 457 Pa. at 579–80, 319 A.2d at 151.

cess right to a requested voluntary manslaughter instruction, as recognized in *Matthews,* applies to all defendants whose convictions were on direct appeal at the time the right was first recognized. Since the trial court denied appellant's request for a voluntary manslaughter charge, he should be granted a new trial.[3]

This disposition, applying the right to all cases pending on direct appeal, is in accord with the rule established 175 years ago in *United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), and followed in *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Thorpe v. Housing Authority,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); *Bradley v. School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); and *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975): on direct appeal a change in the law should be applied by the reviewing court even though the trial court may have acted in consonance with the state of the law at the time of its ruling. This way individuals who are similarly situated are awarded the same treatment by the courts, and the court's duty to administer equal justice is preserved.

## I.

## DENIAL OF APPELLANT'S REQUESTED CHARGE VIOLATES THE STATE AND FEDERAL CONSTITUTIONS.

In Pennsylvania, a trial judge, upon request, must charge the jury on voluntary manslaughter, even where there is no evidence of voluntary manslaughter. *Commonwealth v. Jones,* supra. Prior to *Jones,* our decisions permitted the trial judge, without standards, to deny a

---

3. In *United States ex rel. Matthews v. Johnson,* supra, 503 F.2d at 349, the relator's petition for habeas corpus was conditionally granted unless ". . . the Commonwealth of Pennsylvania affords Matthews a new trial . . . ."

174

requested voluntary manslaughter instruction.[4] Vesting a trial court with this unbridled discretion violates the United States [5] and Pennsylvania [6] Constitutions.

In every prosecution for murder, a jury may return, and the court must accept, a verdict of voluntary manslaughter even in light of evidence tending to prove murder.[7] There are two reasons for this power. First, voluntary manslaughter, our cases establish, is a lesser included offense of murder.[8] Second, a jury pursuant to

4. See note 10 infra.

5. U.S.Const. amend. XIV, § 1.

6. Pa.Const. art. I, §§ 6, 9.

7. "[U]nder an indictment charging murder, a defendant may be convicted of voluntary manslaughter and a conviction for the latter crime will be sustained though it may clearly appear from the evidence that defendant was in fact guilty of a higher grade." *Commonwealth v. Arcuroso,* 283 Pa. 84, 87, 128 A. 668, 670 (1925); accord, *Commonwealth v. Hill,* 444 Pa. 323, 326, 281 A.2d 859, 860 (1971); *Commonwealth v. Hoffman,* 439 Pa. 348, 356–57, 266 A.2d 726, 730–31 (1970); *Commonwealth v. Harry,* 437 Pa. 532, 535, 264 A.2d 402, 404 (1970) (per curiam); *Commonwealth v. Dennis,* 433 Pa. 525, 528–29, 252 A.2d 671, 672–73 (1969); *Commonwealth v. Cooney,* 431 Pa. 153, 157, 244 A.2d 651, 653 (1968); *Commonwealth v. Pavillard,* 421 Pa. 571, 576–77, 220 A.2d 807, 810 (1966); *Commonwealth v. Frazier,* 420 Pa. 209, 211–13, 216 A.2d 337, 338 (1966); *Commonwealth v. Frazier,* 411 Pa. 195, 202, 191 A.2d 369, 373 (1963); *Commonwealth v. Moore,* 398 Pa. 198, 157 A.2d 65 (1959); *Commonwealth v. Nelson,* 396 Pa. 359, 363, 152 A.2d 913, 915 (1959); *Commonwealth v. Steele,* 362 Pa. 427, 430, 66 A.2d 825, 827 (1949); *Commonwealth v. Kellyon,* 278 Pa. 59, 61–62, 122 A. 166, 167 (1923); *Commonwealth v. McMurray,* 198 Pa. 51, 60, 47 A. 952, 953 (1901); *Commonwealth v. Gable,* 7 S. & R. 423 (Pa.1821).

8. E. g., *Commonwealth v. Hoffman,* 439 Pa. 348, 358–59, 266 A.2d 726, 732 (1970); *Commonwealth v. Pavillard,* 421 Pa. 571, 576–77, 220 A.2d 807, 810 (1966); *Commonwealth v. Frazier,* 420 Pa. 209, 211–12, 216 A.2d 337, 338 (1966); *Commonwealth v. Frazier,* 411 Pa. 195, 202, 191 A.2d 369, 373 (1963); *Commonwealth v. Nelson,* 396 Pa. 359, 363–64, 152 A.2d 913, 915–16 (1959); *Commonwealth v. Steele,* 362 Pa. 427, 430, 66 A.2d 825, 827 (1949); *Commonwealth v. Arcuroso,* 283 Pa. 84, 87, 128 A. 668, 670 (1925); *Commonwealth v. Kellyon,* 278 Pa. 59, 61–64, 122 A. 166, 167–68 (1923). See also *Commonwealth v. Kenney,* 449 Pa. 562, 570, 297 A.2d 794, 798 (1972) (Opinion of Roberts, J., dissenting, joined by Pomeroy and Manderino, JJ.); *Commonwealth v. Matthews,* 446 Pa. 65, 77, 78, 285 A.2d 510, 516 (1971) (Roberts, J., dissenting)

its inherent mercy dispensing power, may, from sympathy or an awareness of extenuating circumstances, find a defendant guilty of a lesser offense than the evidence court could support.[9] This Court has recognized manslaughter verdicts so returned as appropriate and acceptable.

Despite the power of the jury to return a voluntary manslaughter verdict, a majority of this Court prior to *Commonwealth v. Jones,* supra, expressed the view that a requested charge on voluntary manslaughter did not have to be given if the trial court concluded that there was no factual basis to warrant such a verdict.[10] This view ac-

(Opinion of Pomeroy, J., dissenting, joined by Roberts, J.); cf. *Commonwealth v. Banks,* 447 Pa. 356, 364, 285 A.2d 506, 509 (1972) (Opinion of Pomeroy, J., dissenting, joined by Roberts, J.).

**9.** E. g., *Commonwealth v. Hill,* 444 Pa. 323, 327, 281 A.2d 859, 861 (1971); *Commonwealth v. Hoffman,* 439 Pa. 348, 358, 266 A.2d 726, 731 (1970); *Commonwealth v. Moore,* 398 Pa. 198, 208, 157 A.2d 65, 71 (1959); *Commonwealth v. Steele,* 362 Pa. 427, 430, 66 A.2d 825, 827 (1949); *Commonwealth v. Kellyon,* 278 Pa. 59, 64, 122 A. 166, 168 (1923). See *United States v. Dougherty,* 154 U.S. App.D.C. 76, 101, 473 F.2d 1113, 1138 (1972) (Bazelon, C. J., concurring in part and dissenting in part). See also *Commonwealth v. Kenney,* 449 Pa. 562, 570, 297 A.2d 794, 798 (1972) (Opinion of Roberts, J., dissenting, joined by Pomeroy and Manderino, JJ.); *Commonwealth v. Banks,* 447 Pa. 356, 364, 285 A.2d 506, 509 (1972) (Opinion of Pomeroy, J., dissenting, joined by Roberts, J.); *Commonwealth v. Matthews,* 446 Pa. 65, 77, 78, 285 A.2d 510, 516 (1971) (Roberts, J., dissenting) (Opinion of Pomeroy, J., dissenting, joined by Roberts, J.).

**10.** E. g., *Commonwealth v. Cannon,* 453 Pa. 389, 396–97, 309 A.2d 384, 389 (1973); *Commonwealth v. Davis,* 449 Pa. 468, 297 A.2d 817 (1972), cert. denied, 414 U.S. 836, 94 S.Ct. 183, 38 L.Ed.2d 72 (1973) (affirmance by equally divided court); *Commonwealth v. Kenney,* 449 Pa. 562, 568–69, 297 A.2d 794, 797 (1972); *Commonwealth v. Banks,* 447 Pa. 356, 363, 285 A.2d 506, 509 (1972); *Commonwealth v. Matthews,* 446 Pa. 65, 74, 285 A.2d 510, 514 (1971); *Commonwealth v. Dews,* 429 Pa. 555, 558–59, 239 A.2d 382, 384–85 (1968); *Commonwealth v. LaRue,* 381 Pa. 113, 121–22, 112 A. 2d 362, 367 (1955); *Commonwealth v. Yeager,* 329 Pa. 81, 85–87, 91, 196 A. 827, 830–31, 833 (1938); *Commonwealth v. Gibson,* 211 Pa. 546, 548, 60 A. 1086, 1087 (1908) (per curiam) (no citation to authority); *Commonwealth v. Sutton,* 205 Pa. 605, 608–09, 55 A. 781, 782 (1903) ("only in clear cases" can voluntary manslaughter charge "properly" be omitted); *Commonwealth v. Eckerd,* 174 Pa. 137, 148–49, 34 A. 305, 305–06 (1896) (no citation to authority)

knowledged the jury's power to return a voluntary manslaughter verdict, but sanctioned the trial court's refusal to give the jury guidance for the exercise of that power.

After *Jones* was filed, the United States Court of Appeals for the Third Circuit, en banc, held that Pennsylvania's pre-*Jones* practice violates the due process clause of the fourteenth amendment. *United States ex rel. Matthews v. Johnson*, supra. The *Matthews* court, in an opinion by Judge Aldisert, held:

> "[T]he safeguards of due process will be satisfied only when all defendants in Pennsylvania murder trials are given the same opportunity, upon request duly made, to have a jury return a verdict of volun-

(but see id. at 151, 34 A. at 307 (dissenting opinion) ); *Commonwealth v. Buccieri*, 153 Pa. 535, 553, 26 A. 228, 235 (1893) (no citation to authority).

*Commonwealth v. Crosmire*, 156 Pa. 304, 27 A. 40 (1893); *Clark v. Commonwealth*, 123 Pa. 555, 16 A. 795 (1889) and *Brown v. Commonwealth*, 76 Pa. 319 (1874), have been cited for the proposition that a trial court may withhold a voluntary manslaughter charge if there is in its opinion no evidence to support such a verdict. See *Commonwealth v. Kenney*, supra, 449 Pa. at 569 n. 8, 297 A.2d at 797 n. 8; *Commonwealth v. LaRue*, supra, 381 Pa. at 122, 112 A.2d at 367; *Commonwealth v. Yeager*, supra, 329 Pa. at 85, 196 A. at 830. The decisions in those cases, however, turned on the narrow point that no request for a voluntary manslaughter charge had been made by defense counsel. See *Commonwealth v. Pavillard*, 421 Pa. 571, 576, 220 A.2d 807, 810 (1966) (no request for voluntary manslaughter charge); *Commonwealth v. Sheets*, 197 Pa. 69, 80, 46 A. 753, 754 (1900) (same).

In several cases which have been employed as authority for the trial court's discretion with respect to voluntary manslaughter charges, the judgment of sentence was reversed, and so, any discussion of the court's power to withhold such a charge was obviously dictum. See e. g., *Commonwealth v. Flax*, 331 Pa. 145, 155–56, 200 A. 632, 637 (1938); *Commonwealth v. Carroll*, 326 Pa. 135, 137, 191 A. 610, 611 (1937); *Commonwealth v. Miller*, 313 Pa. 567, 569, 170 A. 128, 129 (1934); *Commonwealth v. Colandro*, 231 Pa. 343, 350–53, 80 A. 571, 574–75 (1911); *Commonwealth v. Curcio*, 216 Pa. 380, 383, 65 A. 792, 793 (1907). In other cases used as authority for this point, a voluntary manslaughter charge had in fact been given. See e. g., *Commonwealth v. Weston*, 297 Pa. 382, 386–87, 147 A. 79, 81 (1929); *Commonwealth v. Bishop*, 285 Pa. 49, 58, 131 A. 657, 661 (1926); *Commonwealth v. McMurray*, 198 Pa. 51, 60–61, 47 A. 952, 953 (1901).

*0*

tary manslaughter as well as first and second degree murder."

503 F.2d at 346 (footnote omitted.) [11]

The relator in *Matthews*, having exhausted all state remedies,[12] petitioned in federal court for a writ of habeas corpus. A federal magistrate recommended that the writ be granted, concluding that the refusal to give a requested charge on voluntary manslaughter constituted a denial of due process even though there was no evidence of voluntary manslaughter. The federal district court adopted the magistrate's reasoning and recommendation, and ordered that the writ be granted.

On appeal, the en banc court of appeals neatly framed the issue.

"The genesis of the federal constitutional problem is the anomaly that although the jury has unfettered power to return a voluntary manslaughter verdict as a lesser included offense of a murder indictment, it could not do so if the trial judge refused to charge on this point. Thus, whether the jury was given this opportunity was solely dependent upon the unrestricted discretion of the trial judge."

503 F.2d at 342 (footnote omitted).

That court then determined that Pennsylvania law has always permitted the trial court to give a voluntary manslaughter instruction in the absence of evidence of passion or provocation.

"Our research has not disclosed a Pennsylvania Supreme Court decision which unequivocally held that, on an indictment for murder, it would be error for a trial judge to charge on voluntary manslaughter where there was no evidence of passion or provocation. The court has had numerous opportunities to do so but in-

11. Although a concurring opinion was filed in *Matthews*, 503 F.2d at 349–50, it is difficult to perceive any substantive difference between the approach and reasoning of the majority and that of the concurrence.

12. *Commonwealth v. Matthews*, 446 Pa. 65, 285 A.2d 510 (1971).

stead has framed its holding in terms of what a defendant has a right to expect or whether the trial court's refusal to instruct was in error. These cases still leave the final decision on whether to charge within the discretion of the trial judge."

503 F.2d at 344 (footnote omitted). The analysis of the court of appeals is in accord with this Court's understanding of our decisions defining the power of the jury to return a verdict of voluntary manslaughter in a murder trial.[13]

The court of appeals held that the relator had been denied due process of law because no standards existed to guide a trial court's discretion on whether to charge on voluntary manslaughter.

"At the time [relator] was tried, the jury was given the option of returning a verdict of murder in the first degree calling for life imprisonment or death,[14] or alternatively, a verdict of murder in the second degree, calling for a sentence of up to twenty years. Another trial judge, or the same judge on another day, could have permitted the jury to return a verdict of voluntary manslaughter, calling for a sentence of no more than twelve years. To deny appellee the possibility of a lesser verdict with a lesser restraint of liberty is permissible only if the denial comports with due process. To deny appellee the possibility of a lesser restraint of liberty because of a practice which permits arbitrary trial court activity is offensive to those settled concepts of due process."

503 F.2d at 345. Accordingly, that court affirmed the grant of habeas corpus relief. I agree with the reasoning of the en banc Court of Appeals for the Third Circuit.[15]

13. See note 10 supra.

14. A footnote in the *Matthews* opinion explains that relator was convicted four years prior to the decision of the United States Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). See 503 F.2d at 345 n. 19.

15. The three Justices of this Court who found our pre-*Jones* practice unconstitutional in *Jones* followed similar reasoning to that

The right to trial by jury is one of the most fundamental rights afforded an accused. The significance of this right was artfully stated in *Williams v. Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446 (1970):

> "[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." [16]

To make this "commonsense judgment" the jury must be fully and correctly instructed on its power and responsibilities.[17] Any other course would permit a jury

of the court of appeals in *Matthews. Commonwealth v. Jones,* supra (Opinion in Support of Reversal) (Opinion of Roberts, J., joined by Pomeroy and Manderino, JJ.).

**16.** See also *Duncan v. Louisiana,* 391 U.S. 145, 155–56, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968) (footnote omitted):
"The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government.
Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Government in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence."

**17.** "Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depended upon discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria."

to proceed blindly in its deliberation on the accused's guilt or innocence. E. g., *Commonwealth v. Young,* 456 Pa. 102, 317 A.2d 258 (1974).

This Court has repeatedly stated that "[t]he primary duty of a trial judge in charging a jury is to clarify the issues so that the jury may understand the questions to be resolved." *Commonwealth v. Jordan,* 407 Pa. 575, 587, 181 A.2d 310, 316 (1962).[18] In every murder prosecution in this Commonwealth, the jury may return and the court must accept, a voluntary manslaughter verdict.[19] Allowing a jury to decide whether criminal sanctions are to be imposed on an individual without adequate instruction as to all permissible verdicts denies the jury information essential to a fair determination of the case.[20] The accused is thereby deprived of due process of law.[21]

*Bollenbach v. United States,* 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946). See also ABA Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge § 5.11(a) & Commentary at 74 (Approved Draft, 1972); ABA Project on Standards for Criminal Justice, Standards Relating to Trial by Jury § 4.6(e) & Commentary at 111–20 (Approved Draft, 1968).

18. See e. g., *Commonwealth v. Young,* 456 Pa. 102, 109 n. 7, 317 A.2d 258, 261 n. 7 (1974); *Commonwealth v. Beach,* 438 Pa. 37, 40, 264 A.2d 712, 714 (1970); *Commonwealth v. Meas,* 415 Pa. 41, 45, 202 A.2d 74, 76 (1964); *Commonwealth v. Frazier,* 411 Pa. 195, 205, 191 A.2d 369, 374 (1963); *Commonwealth v. Malone,* 354 Pa. 180, 187–88, 47 A.2d 445, 449 (1946). See also *United States v. Clark,* 475 F.2d 240, 248, 251 (2d Cir. 1973); *United States v. Persico,* 349 F.2d 6, 8 (2d Cir. 1965).

19. See cases cited, note 7 supra.

20. The sole policy that was articulated to justify a trial court's discretion to withhold a charge on voluntary manslaughter was that "[a] charge on a point or issue which is unsupported by any evidence is likely to confuse the jury and obstruct Justice." *Commonwealth v. Pavillard,* 421 Pa. 571, 576–77, 220 A.2d 807, 810 (1966). Although this statement may be true as a general rule, it does not apply to the question whether a voluntary manslaughter charge must be given in every murder case. It is inapplicable because in murder prosecutions the presence or absence of evidence of the distinguishing elements of voluntary manslaughter does not affect the jury's power to return a voluntary manslaughter verdict. The argument against requiring, upon re-

This constitutional infirmity is exacerbated by leaving the decision whether to withhold a requested instruction on voluntary manslaughter to the trial judge's unfettered discretion. As the court of appeals recognized in *Matthews*:

"A lack of any standard to guide a decision which has the capability of restricting the liberty or property of a defendant would seem to offend settled concepts of due process."

503 F.2d at 345.

The *Matthews* court was counseled by the decision of the Supreme Court of the United States in *Giaccio v. Pennsylvania*, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966). There, the Supreme Court held unconstitutional a Pennsylvania statute that permitted a jury in misdemeanor cases to impose the costs of prosecution on an acquitted defendant. The statute was held invalid because it did not provide any standards for the exercise of the jury's discretion. The Supreme Court stated:

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case. See e. g., *Lanzetta v. New Jersey*, 306 U.S. 451,

---

quest, a voluntary manslaughter charge in all murder cases necessarily rests on the premise that it is better for the jury to exercise in ignorance its undisputed power to return a voluntary manslaughter verdict. The illogic, irrationality, and unfairness of keeping relevant and helpful information from the jury is obvious. Cf. *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). See also *Commonwealth v. Cannon*, 453 Pa. 389, 398, 309 A.2d 384, 390 (1973) (Roberts, J., dissenting); id. at 400, 309 A.2d at 390 (Pomeroy, J., dissenting); *Commonwealth v. Davis*, 449 Pa. 468, 477, 297 A.2d 817, 818 (1972); cert. denied, 414 U.S. 836, 94 S.Ct. 183, 38 L.Ed.2d 72 (1973) (Opinion in Opposition to Order); id. at 479, 297 A.2d at 818 (same); *Commonwealth v. Matthews*, 446 Pa. 65, 77, 78, 285 A.2d 510, 516 (1971) (Roberts, J., dissenting) (Pomeroy, J., dissenting, joined by Roberts, J.).

21. U.S.Const. amend. XIV, § 1; Pa.Const. art. I, §§ 6, 9.

59 S.Ct. 618, 83 L.Ed. 888 (1939) ; *Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). This 1860 Pennsylvania Act contains no standards at all, nor does it place any conditions of any kind upon the jury's power to impose costs upon a defendant who has been found by the jury to be not guilty of the crime charged against him. . . . Certainly one of the basic purposes of the Due Process Clause has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land. Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce. This state Act as written does not even begin to meet this constitutional requirement."

382 U.S. at 402–03, 86 S.Ct. at 520–21. See also *United States ex rel. Matthews v. Johnson,* 503 F.2d at 344–46.

Thus, like *Giaccio* our pre-*Jones* practice, which did not provide any standards for the exercise of a trial court's discretion in deciding whether to deliver a requested charge on voluntary manslaughter, violates due process.

## II.

THE CONSTITUTIONAL RIGHT TO A VOLUNTARY MANSLAUGHTER INSTRUCTION, UPON REQUEST, SHOULD BE APPLIED TO THIS CASE AND ALL CASES PENDING ON DIRECT APPEAL.[22]

This Court should apply the principle first announced in *United States v. Schooner Peggy,* supra, and adhered to today:

"But if, subsequent to the judgment, and before the decision of the appellate court a law intervenes and

22. In *United States ex rel. Cannon v. Johnson,* 536 F.2d 1013 (3d Cir. 1976), a panel of the Court of Appeals for the Third Circuit,

.

positively changes the rule which governs, the law must be obeyed, or its obligation denied . . . . In such a case the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside."

5 U.S. (1 Cranch) at 110.

The Supreme Court has expanded the principle enunciated in *Schooner Peggy* in other areas of the law. *Ziffrin, Inc. v. United States*, 318 U.S. 73, 78, 63 S.Ct. 465, 469, 87 L.Ed. 621 (1943) (change in ICC regulations); *Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941) (change in prior ruling as to compensability in tort for certain occupational diseases); *United States v. Chambers*, 291 U.S. 217, 54 S. Ct. 434, 78 L.Ed. 763 (1934) (twenty-first amendment

in an opinion by Judge Kalodner, the sole dissenter in *Matthews*, denied relief to a habeas petitioner who had been tried before our decision in *Jones*. Thus, the panel denied relief in a case identical to *Matthews*. In addition, even though the district court in *Cannon* stated that ". . . this case does not squarely raise the question of the applicability of *Matthews* to direct appeals before the Pennsylvania Supreme Court," Judge Kalodner's opinion went on to state that "*Matthews* is inapplicable to pending, and/or future appeals from pre-*Matthews* murder verdicts." The panel's pronouncement on an issue not presented is troublesome, particularly since the precise issue was then pending before this Court.

The panel's announcement that the en banc *Matthews* rule does not apply to pre-*Matthews* cases on direct appeal in the state courts does not mandate the same conclusion by this Court. First, that statement is unnecessary to the decision in *Cannon*, a collateral attack, and, therefore, is mere dictum. Second, even if that statement is a "holding," it does no more than indicate that the panel does not believe the United States Constitution requires application of the *Matthews* rule to cases on direct appeal. This Court, however, is free to apply our ruling to cases on direct appeal either under the Pennsylvania Constitution or under our inherent supervisory powers over the state courts. State courts are free to accord greater rights under state law than mandated by the federal constitution. See *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967); *Commonwealth v. Triplett*, 462 Pa. 244, 341 A.2d 62 (1975).

repealing eighteenth amendment applied to dismiss indictments for violations of National Prohibition Act where cases not final on effective date of twenty-first amendment).

The Supreme Court has reaffirmed this principle in recent years. *Thorpe v. Housing Authority,* 393 U.S. 268, 282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969) (HUD eviction procedures changed during pending eviction proceedings); *Bradley v. School Board,* 416 U.S. 696, 710–22, 94 S.Ct. 2006, 2016–21, 40 L.Ed.2d 476 (1974) (per Blackmun, J. for a unanimous Court); *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (change in the constitutional law concerning obscenity during pendency of appeal from conviction).

Most recently, the Supreme Court held that amendments to the Federal Election Campaign Act passed by Congress in the period between the initiation of the lawsuit and its consideration by that Court required the reversal of the court of appeals holding that the plaintiff had a private right of action as a citizen or stockholder to secure injunctive relief against a corporation alleged to be in violation of that federal law. *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Cf. *Brubaker v. Reading Eagle Co.,* 422 Pa. 63, 221 A.2d 190 (1966).

In *Hamling,* the Supreme Court applied the principle of *Schooner Peggy* to criminal convictions obtained before *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) was announced, but which were pending on direct appeal:

"Our *Miller* decisions dealing with the constitutional aspects of obscenity prosecutions were announced after the petitioners had been found guilty by a jury, and their judgment of conviction affirmed by a panel of the Court of Appeals. Our prior decisions establish a general rule that a change in the law occurring after a relevant event in a case will be given effect while the

case is on direct review. *United States v. Schooner Peggy,* 1 Cranch 103, 2 L.Ed. 49 (1801); *Linkletter v. Walker,* 381 U.S. 618, 627, 85 S.Ct. 1731, 1736, 14 L. Ed.2d 601 (1965); *Bradley v. School Board of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed. 2d 476 (1974). Since the judgment in this case has not become final, we examine the judgment against petitioners in the light of the principles laid down in the *Miller* cases."

*Hamling v. United States,* 418 U.S. 87, 101–02, 94 S.Ct. 2887, 2899–2900, 41 L.Ed.2d 590 (1974); accord *Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974).

In *United States v. Fitzgerald,* 545 F.2d 578 (7th Cir. 1976), the United States Court of Appeals for the Seventh Circuit followed the principle of *Schooner Peggy* to apply *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), to a case pending on direct appeal. In rejecting petitioners' argument that *Beckwith* should not be applied retroactively to their case, the court noted:

"This argument must fail because these cases, where a change in the law has occurred between the date on which the lower courts ruled and the date on which that ruling was considered by us on direct appeal, do not involve a true question of retroactivity. It is well established that when a lower court relies on a legal principle which is changed by a treaty, statute or decision prior to direct review, an appellate court must apply the current law rather than the law as it existed at the time the lower court acted." (citations omitted).

Accord, *Saiken v. Bensinger,* 546 F.2d 1292 (7th Cir. 1976).

This Court has followed the principle enunciated in *Schooner Peggy* in determining the applicability of new constitutional rights to cases pending on direct appeal. See e. g., *Commonwealth v. Chaney,* 465 Pa. 407, 350 A.

2d 829 (1975), where a majority of this Court held that a defendant whose case is on direct appeal is entitled to the benefit of our decision in *Commonwealth v. McCutchen*, 463 Pa. 90, 343 A.2d 669 (1975); accord *Commonwealth v. Little*, 432 Pa. 256, 248 A.2d 32 (1968); see *Commonwealth v. Jefferson*, 430 Pa. 532, 243 A.2d 412 (1968) (Opinion of Roberts, J., dissenting, joined by Cohen and O'Brien, JJ.); *Commonwealth v. Dravecz*, 424 Pa. 582, 227 A.2d 904 (1964).

Legal scholars have noted that:

". . . it has long been held that if there is a change in either the statutory or decisional law before final judgment is entered, the appellate court must 'dispose of [the] case according to the law as it exists at the time of final judgment, and not as it existed at the time of trial.' This rule is usually regarded as being founded upon the conceptual inability of a court to enforce that which is no longer the law, even though it may have been the law at the time of trial . . . ." [23]

I believe the principle enunciated in *Schooner Peggy* best resolves the complex of values implicated in cases pending on direct appeal.[24]

Legal scholars have recognized that failure to apply an existing rule of constitutional decision to cases on direct

[23]. Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.Rev. 907, 912 (1962) (insertion in original) quoting *Montague v. Maryland*, 54 Md. 481, 483 (1880).

[24]. When a court determines that it will apply the new right to set aside convictions on direct appeal, but deny relief to prisoners whose time for appeal is passed, it is following the " 'final-judgment rule' of retroactivity." Johnson, Retroactivity in Retrospect, 56 Cal.L.Rev. 1612, 1613 (1968). I believe that the final-judgment rule is the best standard to determine the applicability of new constitutional rights.

The determination whether a "new" rule is applied on direct appeal is a substantially different question than that raised by a collateral attack. Mishkin, The High Court, The Great Wit and Due Process of Time and Law, 79 Harv.L.Rev. 56 (1962) [hereinafter cited as Mishkin, The High Court].

appeal undermines the court's role as an impartial institution of equal justice which declares the law. Courts' legitimacy depend on

". . . the strongly held belief that judges are bound by a body of fixed, overriding law, that they apply the law impersonally and impartially, that they exercise no individual choice and have no program of their own to advance. . . .

. . . . . . .

Prospective limitation of judicial decisions wars with this symbol." [25]

25. Mishkin, The High Court, supra note 24 at 62, 64. See Von Moschzisker, Stare Decisis in Courts of Last Resort, 37 Harv.L. Rev. 409 (1924); Note, The Effect of Overruled and Overruling Decisions on Intervening Transactions, 37 Harv.L.Rev. 1403, 1412 (1934).

Under the declaratory theory of the judicial process, whose foremost exponent was Blackstone, judges did not "pronounce a new law, but maintain[ed] and expound[ed] the old one." 1 Blackstone, Commentaries * 69. A judge declared rather than created laws.

"Thus a later judicial decision which seems to change the law has not really changed it at all but has only discovered the 'true' rule which was always the law. It follows that any judicial 'change' in the law must necessarily be retroactive."

Levy, Realist Jurisprudence and Prospective Overruling, 109 U. Pa.L.Rev. 1, 2 (1960).

Although Blackstonian jurisprudence has been criticized in archaic (see e. g., id.), it still provides a viable conception of the judicial process which gives courts the prestige and legitimacy necessary to their effective functioning. Professor Mishkin has noted that the criticisms of the analytical tenets of Blackstonian jurisprudence do not "dispose of nor dispense with the reasons for retroactive application of judicial decisions:"

". . . the announcement that 'the rule adopted today is to be effective only from this date forward' [is] inconsistent with the basic symbolic view of the judicial process. Prospective lawmaking is generally equated with legislation. . . . [I]t is ordinarily taken for granted (particularly under the Blackstonian symbolic conception) that judicial decisions operate with inevitable retroactive effect. . . . [T]he establishment of a power of prospective limitation produces sharp and recurrent conflict with the symbolic ideal reflected in the Blackstonian concept and with the emotional loyalties it commands."

Mishkin, The High Court, supra note 24 at 65–66. For a discussion of the importance of a court's image as a "distinguished de-

In addition, failure to afford a defendant a constitutional right recognized as existing at the time of his direct appeal is at odds with the proper functioning of the judicial process. By its nature the judicial process is retroactive. Courts depart from their area of competency when they engage in purely prospective announcement of new constitutional rights.

> "[I]t is the basic rule of courts to decide disputes after they have arisen. That function requires that judicial decisions operate . . . with retroactive effect. . . ." [26]

Thus, the Opinion in Support of Affirmance departs from sound jurisprudential principles in denying appellant the benefit of the due process right to a requested voluntary manslaughter instruction.

Retroactivity has generated a large body of judicial and scholarly debate.[27] The first major United States

cision maker applying fundamental values reflected in the Constitution," see Israel, The "Art" of Overruling, 1963 Supreme Court Review 211, 215–19. See also Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.Rev. 907, 931 (1962).

**26.** Mishkin, The High Court, supra note 24 at 60.

**27.** See e. g., *Desist v. United States,* 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); *Tehan v. United States,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Kuhn v. Fairmont Coal Co.,* 215 U.S. 349, 372, 30 S.Ct. 140, 148, 54 L. Ed. 228 (1910); Aldisert, The Judicial Process, 877–938 (1976); Shulman, Retroactive Legislation, 13 Encyc.Soc.Sci. (1943); Gray, The Nature and Sources of the Law (2d ed. 1921); 1 Blackstone Commentaries * 69–70; Johnson, Retroactivity in Retrospect, 56 Cal.L.Rev. 1612 (1968); Schwartz, Retroactivity, Reliability and Due Process: A Reply to Professor Mishkin, 33 Chi.L.Rev. 719 (1966); Currier, Time and Change in Judge-Made Laws; Prospective Overruling, 51 Va.L.Rev. 201 (1965); Meader, Habeas Corpus and the Retroactivity Illusion, 50 Va.L.Rev. 1115 (1964); Bender, The Retroactive Effect on an Overruling Constitutional Decision, 110 U.Pa.L.Rev. 650 (1962); Mishkin, The High Court, supra note 24; · Note, The Effect of Overruled and Overruling Decisions on Intervening Transactions, 47 Harv.L.Rev. 1403 (1934); Note, Linkletter, Shott and the Retroactivity Problem in Escobedo, 64 Mich.

Supreme Court case to confront the issue was *Linkletter v. Walker,* supra. In *Linkletter,* the Court declined to apply *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961),[28] to state convictions which had become final [29] prior to the overruling of *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).[30]

*Linkletter* was the first case in which a majority of the Supreme Court recognized its power to give constitutional rules prospective operation: [31]

"It is true that heretofore, without discussion, we have applied new constitutional rules to cases finalized before the promulgation of the rule."

381 U.S. at 628, 85 S.Ct. at 1737.

L.Rev. 832 (1966); Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.Rev. 907 (1962).

**28.** In *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the United States Supreme Court overruled *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), and held that the exclusionary rule of the fourth amendment applies to the states.

**29.** "By final we mean where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before our decision in *Mapp v. Ohio.*"
381 U.S. at 622 n. 5, 85 S.Ct. at 1734 n. 5. See *Commonwealth v. Cavell,* 423 Pa. 597, 225 A.2d 673 (1967).

**30.** In *Wolf,* supra, the United States Supreme Court refused to hold that the exclusionary rule which it had applied to the federal government in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) also applied to the states.

**31.** The Court recognized that "at common law there was no authority for the proposition that judicial decisions made law only for the future." 381 U.S. at 622, 85 S.Ct. at 1734. See e. g., *Kuhn v. Fairmont Coal Co.,* supra, 215 U.S. at 372, 30 S.Ct. at 148 (dissenting opinion of Holmes, J.)
"I know of no authority in this court to say that, in general, state decisions shall make law only for the future. Judicial decisions have had retrospective operation for near a thousand years."
For discussion of the relationship between retroactivity and Blackstonian jurisprudence see note 25, supra.
Although Linkletter was the first case in which a majority articulated a general power of prospective overruling, individual justices had suggested that specific decisions be given limited ret-

"[W]e believe that the Constitution neither prohibits nor requires retrospective effect. . . .

"Once [it] is accepted that we are neither required to apply, nor prohibited from applying, a decision retrospectively, we must then weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation."

Id. at 629, 85 S.Ct. at 1737–38.

The court denied habeas corpus relief relying on its balancing of the three factors enunciated above.

*Linkletter,* however, did not involve the issue of "pure" prospectivity,[32] for the decision which announced the new rule was applied to the litigants before the court.[33] The Court's discussion of its power to limit new constitutional rules to prospective effect was unnecessary to its result.[34]

----

roactive or prospective effect. Mishkin, The High Court, supra note 24, at 57 and cases cited at n. 5.

"Prior to the 1964 Supreme Court Term, decisions promulgating new constitutional rules were applied retroactively as a matter of course to final convictions. While dissents occasionally criticized the Court's failure to discuss the retroactive impact of a new constitutional rule, the potential effect upon final convictions of any single rule was not sufficiently acute to justify a departure from the normal grant of retroactivity."

Note, Linkletter, Shott and the Retroactivity Problem in Escobedo, 64 Mich.L.Rev. 832 (1966).

32. When a decision is purely prospective it is not applied even to the litigants before the court.

33. The Court announced the new rule in *Mapp v. Ohio,* supra, and applied it to reverse Miss Mapp's conviction.

34. Mishkin, The High Court, supra note 24. Subsequent cases unfortunately followed *Linkletter's* unnecessarily broad rationale, rather than its sound result.

"The inappropriateness of the prospective limitation approach as a rationale for the *Linkletter* does not mean that the result itself is unsound. . . . *Mapp's* retroactivity appears as normal in two ways. First, . . . the application of the new rule to the facts of that case . . . partakes of the ordinary application of the judicial process. Second, the unhes-

Although it denied relief on collateral attack, the Court upheld the application of *Mapp* to all cases pending when *Mapp* was decided. In approving the applica-

itating application of that new rule to all other convictions not yet final at the time of the *Mapp* decision, though not necessarily to those which were, is similarly normal judicial operation. The doctrine that a final judgment entered under a given rule of law may withstand subsequent judicial change in that rule is long established . . . ."

Id. at 77.

Professor Mishkin also asserts that because of the nature of the writ of habeas corpus, and the importance of finality, only those "new" constitutional rules which go to the reliability of the guilt-determining process need be given full retroactive effect. Mishkin, The High Court, supra note 24 at 77–92. The Supreme Court has to a large extent adopted the analysis of Professor Mishkin. Kamisar, LaFave, Israel, Modern Criminal Procedure 666 (1974). However, Professor Mishkin only advocated this approach to the issue of retroactivity in the context of collateral attacks. He believed that the result in *Linkletter* was sound: a change in the law should be implemented by the reviewing court for those cases which are still pending on direct appeal on the date of the overruling decision.

Unfortunately, the United States Supreme Court has misconstrued Mishkin's theory by applying it to both direct appeals and habeas corpus petitions. Since *Johnson v. New Jersey,* supra, the Court has given full retroactive effect to "new" constitutional rules only where the "major purpose of new constitutional doctrine is to overcome an aspect to the criminal trial that substantially impairs its truth-finding function." *Williams v. United States,* 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971). While this analysis is persuasive in considering whether a "new" rule should be applied retroactively to a habeas corpus petition, it should not be applied to cases pending on direct appeal.

Mishkin argues:

". . . that the Supreme Court should not claim a general power to declare decisions non-retroactive, but that it should instead consider whether the purposes of federal habeas corpus would be served by using that remedy to overturn final judgments of conviction on the basis of a newly recognized right. Mishkin would allow the use of federal habeas corpus to challenge convictions that became final after the date of the overruling decision, however, in order that the power of the lower federal courts to force the state to observe federal constitutional rights be preserved."

Johnson, Retroactivity in Retrospect, 56 Cal.L.Rev. 1612, 1615 (1968).

tion of *Mapp* to cases not yet final, the Court simply applied the principle of *Schooner Peggy*: [35]

> "Under our cases it appears . . . that a change in law will be given effect while a case is on direct review, *Schooner Peggy,* supra."

381 U.S. at 626, 85 S.Ct. at 1736. Moreover, the Court recognized that the principle enunciated in *Schooner Peggy* made "no distinction . . . between civil and criminal litigation." Id.

The Opinion in Support of Affirmance asserts that the three factors which are considered in determining whether a "new" constitutional right will be given retroactive effect [36] do not justify distinguishing between cases not yet final and those on collateral attack. I cannot agree.

Although I believe that the three factors articulated in *Stovall v. Denno,* supra, should be considered in determining whether to give a new constitutional right retrospective effect on collateral attack, they are inappropriate in determining the applicability of new rules to cases not yet finalized.[37] To the extent that these criteria are interpreted to preclude a distinction between cases on direct appeal and those on post conviction,[38] I must dis-

---

**35.** The Supreme Court followed the approach utilized in *Linkletter* in *Tehan v. United States ex rel. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), applying *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) to all cases not yet final. See also *In re Gaines,* 63 Cal.2d 234, 45 Cal.Rptr. 865, 404 P.2d 473 (1965) where the California Supreme Court adopted the final judgment rule in determining whether *Griffin v. California,* supra, should be applied to cases pending on direct appeal. Accord *People v. Charles,* 66 Cal.2d 330, 57 Cal.Rptr. 745, 425 P.2d 545 (1967).

**36.** "(a) the purpose to be served by the new standard;
"(b) the extent of the reliance by law enforcement authorities on the old standards; and
"(c) the effect on the administration of justice of a retroactive application of the new standards."
*Stovall v. Denno,* supra, 388 U.S. at 297, 87 S.Ct. at 1970.

**37.** See supra note 34.

**38.** I recognize that the United States Supreme Court may have departed from the sound result of *Linkletter v. Walker,* supra.

agree.[39] There are significant distinctions between direct appeal and collateral attack. To ignore these differences, and refuse to apply changes in decisional law to cases pending on direct appeal unnecessarily undermines the appellate process, leaving it a half-hearted fulfillment of judicial review.

This Court should adopt the view expressed by Justice Harlan:

"Upon reflection, I can no longer accept the rule . . . which permits this Court to apply a 'new'

See e. g., *Daniel v. Louisiana,* 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed. 2d 790 (1975); *Michigan v. Payne,* 412 U.S. 47, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1973); *Desist v. United States,* 384 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

However, this Court is not limited to the United States Supreme Court's interpretation of retroactivity. See *Great North. Railroad v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932); *In re Estate of Melody,* 42 Ill.2d 451, 248 N.E.2d 104 (1969).

"Nothing prevents the States from giving full retrospective effect to any constitutional decision which the Supreme Court has not treated so generously."

Haddad, Retroactivity Should be Rethought: A Call for the End of the Linkletter Doctrine, 60 J.Crim.L. 417, 418 (1969).

We are free to apply a ruling that our pre-*Jones* practice is unconstitutional to cases on direct appeal, either under the Pennsylvania Constitution or under our inherent supervisory powers over state courts. The retroactivity of a decision may itself be a question of state law. Moreover, states are free to accord greater rights under state law than are afforded by the federal constitution. See e. g., *State v. Opperman,* 247 N.W.2d 673 (S.D.1976); *Oregon v. Hass,* supra; *Commonwealth v. Triplett,* supra.

**39.** In refusing to distinguish between direct appeal and habeas corpus, the Court has sacrificed equality for administrative concerns.

"The determination of whether a Supreme Court decision recognizing constitutional rights . . . will be given retroactive application, is a perplexing problem . . .. The Court's dilemma is in balancing the equities of persons convicted by unconstitutional procedures against the obvious burden which would necessarily be placed on both the judicial system and the prosecution, should all such persons be granted new trials. *In attempting to balance the above interests,* . . . *the Court has ignored the mandates of equal protection.*"

Note, Partial Retroactivity, A Question of Equal Protection, 43 Temp.L.Q. 239 (1970) (emphasis added).

constitutional rule entirely prospectively, while making an exception only for the particular litigant whose case was chosen as the vehicle for establishing the rule. Indeed, I have concluded that *Linkletter* was right in insisting that all 'new' rules of constitutional law must, at a minimum, be applied to all those cases which are still subject to direct review by this Court at the time the 'new' decision is handed down.

. . . . . . . .

"We do not release a criminal from jail because we like to do so . . . but only because the Government has offended constitutional principle in the conduct of his case. And when another similarly situated defendant comes before us, we must grant the same relief or give a principled reason for acting differently. We depart from this basic judicial tradition when we simply pick and choose from among similarly situated defendants who alone will receive the benefit of a 'new' rule of constitutional law."

*Desist v. United States,* 394 U.S. 244, 256–60, 89 S.Ct. 1030, 1038–39, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting).

The ends of justice are best served by appellate courts, applying a change in the law even though the trial court may have acted in consonance with the state of the law at the time of its ruling. This insures that individuals similarly situated are accorded the same treatment on direct appeal.[40]

**40.** *Matthews,* supra, 503 F.2d at 345. See also, the hypothetical fact situation illustrating the unfairness which could result when decisions are given purely prospective application in Currier, Time and Change in Judge-Made Law; Prospective Overruling, 51 Va.L.Rev. 201, 201–05 (1965). When courts limit the application of a new constitutional rule to the parties in the particular case, and otherwise give it entirely prospective effect, it "produces intolerable inequality." Mishkin, The High Court, supra note 24 at 61. See also Bender, The Retroactive Effect of an Overruling

The injustice of the failure to apply "new" law to cases on direct appeal is well articulated by former Chief Justice Roger Traynor of the California Supreme Court. Criticizing the United States Supreme Court's failure, in *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), to apply *Miranda v. Arizona* to all cases on direct appeal, former Chief Justice Traynor writes:

"There is no wisdom, however, in the technique involved in *Johnson v. New Jersey*.[41] Equal justice before the law has been the proud boast of Anglo-American judges for generations. Why then give four defendants . . . the benefit of the new rule and deny it to the other 129 defendants whose pending cases also raised the *Miranda* issue? As Justice Harlan has noted in another case [*Mackey v. United States*, 401 U.S. 667, 679, 91 S.Ct. 1160, 1173, 28 L.Ed.2d 404 (1971)] the court 'was simply fishing one case from the stream of appellate review, using it as a vehicle for

Constitutional Decision: *Mapp v. Ohio*, 110 U.Pa.L.Rev. 650, 675–677.

"[D]enying the benefit of a newly recognized right to similarly situated persons, is acting in derogation of the Equal Protection Clause. There can be no doubt that *Linkletter* was correct in insisting that all 'new' rules of constitutional law must be applied . . . to cases still subject to direct review at the time the 'new' decision is rendered. When similarly situated persons come before the Court, similar relief must be granted. When the Court simply picks and chooses, from among similarly situated defendants, the fundamental guarantee of equal protection is denied to those not fortunate enough to be chosen. Surely, retroactivity must be rethought."

Note, Partial Retroactivity: A Question of Equal Protection, 43 Temp.L.Q. 239, 240 (1970).

**41.** The Court's holding in *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) "is open to considerable question . . . [T]he inequity of denying relief to all other petitioners before the court on direct review who had diligently pursued the point in their briefs, while granting relief to Miranda and the three other petitioners whose cases had fortuitously been selected for announcement of the new rule, was apparent to everyone." Johnson, Retroactivity in Retrospect, 56 Cal.L.Rev. 1612, 1621 (1968).

pronouncing new constitutional standards and then permitting similar cases to flow by unaffected by that new rule.' It was purely fortuitous that the case of the four lucky defendants given the benefit of the new *Miranda* rules was heard ahead of the other cases. As Justice Shaeffer of the Illinois Supreme Court has noted, 'Too many irrelevant considerations, including the common cold, bear upon the rate of progress through the judicial system.' "

R. Traynor, "Quo Vadis, Prospective Overruling, A Question of Judicial Responsibility," University of Birmingham, England (1975). Failure to apply a "new" rule of constitutional decision to cases on direct appeal reflects, in former Chief Justice Traynor's words "a lack of evenhanded justice."

I am aware that the trial court in this case may have relied on the pre-*Jones* practice in refusing to give the requested instruction on voluntary manslaughter. This reliance was of course justified. But the reliance by trial courts is not a factor of such magnitude to compel us to refrain from applying the rule to cases on direct appeal. As former Chief Justice Traynor noted:

"Normally, however, reliance plays an inconsequential role, if any, in criminal cases . . . .

. . . .

". . . I find inadequate such criteria as the Supreme court has invoked for governing the issue of prospectivity, namely, the purpose of the new rule, the extent of reliance by law enforcement authorities, and the effect on the administration of justice. The inadequacy lies mainly in the failure to weigh against the foregoing considerations the hardship and inequity suffered by those who are denied the benefit of the new rule and compelled to bear the burden of what is now admittedly recognized as an unjust rule. Their hardship, particularly imprisonment . . . , would seem to outweigh the reliance of law enforcement

agencies and the increased burden on the administration of justice that equal treatment of those equally situated would entail."

Application of a defendant's due process right to a voluntary manslaughter instruction to cases on direct appeal will not unduly burden the trial courts as the Commonwealth contends. Mr. Justice Stevens dismissed a similar argument in *Henderson v. Morgan*, 426 U.S. 637, 645, 96 S.Ct. 2253, 2258, 49 L.Ed.2d 108 (1976), "We think [such] fears are exaggerated." More important, however, the same, correct, rule of law will be applied in all cases on direct appeal, and that best comports with the American tradition of fair play and equal justice.

"Neither good faith reliance by state . . . authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice suffice[s]" to justify the denial of the constitutional right to a voluntary manslaughter instruction, upon request, to defendants whose cases are pending on direct appeal. *Ivan v. City of New York*, 407 U.S. 203, 204, 92 S.Ct. 1951, 1952, 32 L.Ed.2d 659 (1972).

O'BRIEN and MANDERINO, JJ., join in this opinion.

OPINION IN SUPPORT OF REVERSAL

MANDERINO, Justice.

I joined in Mr. Justice Robert's opinion in support of reversal. However, I must express additional disagreement with the opinion in support of affirmance. That opinion applies with approval, and without proper analysis, the three factors adopted by the U. S. Supreme Court in *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). I do not agree that those three factors, as stated, may appropriately be used to determine whether an accused in this Commonwealth is entitled to the benefit of a newly announced constitutional right, or

to the benefit of a rule newly formulated pursuant to our supervisory powers to insure that a person convicted of a crime is *justly* being deprived of his liberty.

The three *Linkletter* criteria are:

(a) the purpose to be served by the new standards;

(b) the extent of the reliance by law enforcement authorities on the old standards; and

(c) the effect on the administration of justice of a retroactive application of the new standards.

The first consideration, according to Mr. Justice Eagen, weighs heavily against appellant here. This, because the *Matthews* rule does not aid the trial's "truth-finding function" but goes to the jury's ability to exercise its historically recognized mercy dispensing power.

In so concluding, the opinion in support of affirmance assumes, without analysis, that the purpose to be served by the *Matthews* rule is "truth-finding." I cannot agree. This assumption is based on too narrow a view of the function of the judicial system. The ultimate function of the judicial system is not simply "truth-finding"; the end sought is *justice*. *Justice* involves not only a verdict of guilt or innocence; it involves sentencing. It involves a determination of whether an accused will lose his liberty for one day, one year, ten years, or for life.

While zealous in its consideration for the "truth-finding" process—for the propriety of the verdict reached—the opinion in support of affirmance shamelessly ignores the question of the justness of the sentence. From the point of view of *justice*, however, the most important question in many prosecutions is the question of *how long* those convicted will be deprived of their liberty.

*Matthews* insures that all persons accused of murder will have an equal chance of obtaining a *just* result—namely, the opportunity of obtaining a determination by the jury that the crime of which he stands convicted is voluntary manslaughter and not murder. In short, in

every homicide case, the accused should have the opportunity of obtaining the lesser *sentence* which will result from a jury's finding of guilty of voluntary manslaughter. The appellant in this case may be unjustly *incarcerated* even if he is guilty of the homicide of which he stands accused.

The purpose of the *Matthews'* rule is to guarantee *justice of the length of incarceration.* Justice therefore requires that all those accused of murder be given the same opportunity to have a jury decrease their period of incarceration by returning a verdict of voluntary manslaughter. It may be that persons deprived of the *Matthews* right were justly found guilty of some crime. It does not follow, however, that the period of incarceration which they must now serve was also justly determined. The test as to whether the "truth-finding" process has been affected may be appropriate as to whether a verdict of guilt is just. It is not a proper test of whether the *sentence* is just. In analyzing the first of the three *Linkletter* factors, therefore, our attention is more appropriately directed toward whether or not the newly announced principle affects the *justice* of the case.

The second factor to be considered, according to the opinion in support of affirmance, is "the extent of the reliance of law enforcement authorities on the old standards." I cannot agree that prosecutorial reliance on the old rule is established merely because they have objected to defendants' requests for voluntary manslaughter instructions in the past. The ruling is made by the trial court; the trial court is the decision maker on whether to charge the jury on voluntary manslaughter. It is, therefore, the *trial courts* which have relied on the old rule— not law enforcement authorities. The reliance by trial courts on the old rule is no different in this case than in any other. A trial court's reliance on a principle newly declared to be erroneous has never before justified a re-

fusal to apply the new rule to cases pending on appeal in this Commonwealth.

The third element according to the opinion in support of affirmance, is "the effect on the administration of justice of a retroactive application of the new standards." In this standard, the word used is *justice*; and *justice* involves *both* the "truth-finding" process which should result in a just verdict of guilt or innocence, and the "sentencing" process which should result in a just period of incarceration.

The opinion in support of affirmance contends that statistics should play a part in determining whether relief is given. The examination should be whether the process is arriving at just final results—including the length of sentence—and not be confined to the narrow approach of determining whether the partial goal of "truth-finding," has been achieved. The simple question before us is this: are there persons whose sentences may be unjustly long because of the judicial process by which they were placed behind bars? The answer is obvious. Those deprived of an opportunity to have the jury return a verdict of voluntary manslaughter are suffering an injustice in sentencing which many others have not suffered. The fact that the number of those so suffering may be large, should not affect our efforts to remedy that injustice. Numbers have not stood as a bar to the application of constitutional principles when those newly announced principles affected the "truth-finding" process. Only when the "truth-finding" process is not affected by the newly announced rule have numbers been considered important, and then only in the sense that if the numbers involved are small, such a principle might be applied retroactively despite its lack of nexus with the "truth-finding" process. *Matthews'* concern, however, is with *justice*, not "truth-finding." When *justice* is affected by the newly announced rule, numbers are as

meaningless to the consideration of the rule's application as they are when the rule affects the "truth-finding" process. If we are to remain true to the goal of providing *justice, Matthews* must be applied equally to all.